THE UNITED STATES FIDELITY AND GUARANTY COMPANY, Appellant, *vs.* THE FIRST NATIONAL BANK OF DUNDEE, Appellee.

*Opinion filed April 23, 1908.*

1. INSURANCE—*a bond issued by a guaranty company is an insurance contract.* A bond which is issued by a guaranty company to indemnify an employer against loss from the dishonesty of an employee is an insurance contract, and is subject to the rules of construction applicable to insurance policies generally, and not to the rules applicable to ordinary sureties for accommodation.

2. SAME—*contracts of guaranty insurance will be liberally construed.* Contracts of guaranty insurance will be liberally construed to accomplish the purpose of indemnity for which they are made, and while a misrepresentation of a material fact, in reliance upon which the contract was made, will avoid the contract in equity, irrespective of the question of knowledge of the falsity of the representation, yet the charge of false representation raises a question of fact, upon which the guaranty company has the burden of proof.

3. SAME—*what does not prove that the bank did not examine books.* The fact that at the time a renewal certificate of a bank cashier's guaranty bond was issued there was one irregularity in

his books for the preceding year, consisting of an additional cipher being placed after the figures "300," does not prove that no examination of the books was, in fact, made by the bank, which certified, in the renewal certificate, that the books were "examined from time to time in the regular course of business" and found to be correct.

4. Same—*renewal certificate of guaranty bond construed as to extent of examination required.* A statement in a renewal certificate of a bank cashier's guaranty bond that his books and accounts were examined by the bank "from. time to time in the regular course of business" and found to be correct, does not mean that such an exhaustive examination was made as would necessarily discover the slightest irregularity that might exist, however cunningly covered up.

5. Same—*renewal certificate is not a new contract for an additional indemnity.* A renewal certificate of a bank cashier's guaranty bond, which provides that the aggregate liability of the guaranty company, from the date of the issuance of the bond to the expiration of the renewal certificate, on account of the acts of such cashier, shall not exceed the sum written opposite his name in the schedule, limits the company's total liability to the face value of the original bond as shown by such schedule, and does not give an additional indemnity for the same amount.

Appeal from the Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. G. A. Carpenter, Judge, presiding.

This is a proceeding in chancery brought by the United States Fidelity and Guaranty Company (hereinafter called the company) against the First National Bank of Dundee (which we will hereinafter call the bank) for the purpose of procuring the cancellation of two certificates renewing and extending the term of a fidelity bond issued by the company February 4, 1901, guaranteeing the bank against any loss it might sustain between January 25, 1901, and January 25, 1902, in consequence of the infidelity of Francis B. Wright, who was employed by the bank as cashier. The company asks for the cancellation of the renewal certificates upon the ground that each of them was procured by the

false and fraudulent representations of the president of the bank. The bill also prayed for an injunction to restrain the bank from prosecuting a suit at law upon the bond and renewal certificates. The answer of the bank specifically denies the charge of false representations contained in the bill. In its answer the bank shows that Wright embezzled $3000 during the first year the bond was in force, $24,513.75 during the second year, and $36,050 during the third year covered by the bond and renewal certificates. The bank filed a cross-bill setting up the bond and the renewal certificates, and prayed for a decree against the company for the amount due the bank. The company, in its answer to the cross-bill, reiterated the claim that the renewal certificates were procured through false representations and denied the right of the bank to recover more than $3000. The cause was heard in open court before Judge Tuley, but before the case was decided Judge Tuley died, and the cause was submitted to Judge Carpenter upon the evidence previously taken before Judge Tuley. The court found against the company upon the charge of misrepresentation and for the bank on its cross-bill, and rendered a decree against the company for the full amount of the bond, and interest thereon, being $11,256.94. This decree has been affirmed by the Appellate Court for the First District, and the company has appealed to this court.

By its amended cross-bill the bank asked to recover $20,000, basing its claim thereto upon the ground that each renewal certificate constituted a new and independent contract, upon which $10,000 is recoverable, provided the embezzlements during the time covered by such renewals amounted to such sum. Both the circuit and Appellate Courts held against the bank upon this question, and it has assigned cross-errors upon the refusal of the court to grant it a decree for $20,000.

We adopt the following statement made by Mr. Justice Freeman in the Appellate Court:

"The bond in question is known as 'an employer's schedule bond.' In it the guaranty company covenanted and agreed with the bank, in respect to those of the bank's employees 'whose name or names appear in the schedule hereto attached (which is hereby referred to and made a part of this bond) in respect to whom the employer requires indemnity of the kind and nature hereinafter provided, * * * that it will, at the expiration of three months after proofs of loss shall have been furnished to the company, pay to the employer the amount of any loss or damage that shall happen to the employer in respect of any funds, property or estate belonging to or in custody of the employer through the dishonesty of any of the employees or through any act of omission or commission of any of the employees done or omitted in bad faith, and not through mere negligence, incompetency or any error of judgment, and whether such dishonesty or such act of omission or commission occurs in the performance of any duty or trust specially assigned to such employee or occurs otherwise.' The liability, under the terms of the original bond, began January 25, 1901, and terminated one year thereafter unless renewed. It is provided in the bond, among other things, that in case the employer be a corporation, 'the knowledge of its board of directors or trustees, or of any executive officers, such as president, vice-president, cashier or assistant cashier of a bank,' shall be deemed the knowledge of the employer, 'unless such officer be in collusion with the employee through whom the loss occurs.' The bond was subject to renewal from year to year by agreement. The schedule attached to the bond contained the name of the cashier of the bank, one Francis B. Wright, on account of whose defalcation the bank is seeking to recover on the bond.

"When the term of the original bond was about to expire at the end of the first year the guaranty company notified the bank, requesting it to fill in, sign and forward a form of certificate which accompanied the letter, and stat-

ing that thereupon 'a renewal receipt will be sent to you and remittance for premium can then be made.' The certificate which was so signed and forwarded by the bank was as follows:

" *'To the United States Fidelity and Guaranty Company*—This is to certify that the books and accounts of the persons in our employ, as per schedule attached, were examined by us from time to time in the regular course of business, and we found them correct in every respect, all moneys handled by them being accounted for. They have performed their duties in an acceptable and satisfactory manner, and we know of no reason why the guarantee bond should not be continued.

FIRST NATIONAL BANK,
Delos Dunton, *Pres.,* Employer.

Dated at Dundee, Ill., Jan'y 22, 1902.'

"A renewal receipt or agreement was thereupon executed by the guaranty company and forwarded to the bank, which continued in force from January 25, 1902, to January 25, 1903. When, at the end of the second year, the bond so renewed was about to expire, the bank was again notified, again executed a certificate as before, and again received a renewal agreement continuing the bond in force until January 25, 1904, 'subject to all the covenants and conditions set forth and expressed in said schedule bond heretofore issued on the 25th day of January, 1901.'

"It appears from the evidence, and is not disputed, that the cashier, Wright, named in the schedule of the bond, embezzled the sum of $3000 belonging to the bank during the first year, while the original bond was in force. During the second year the sum embezzled was $24,513.75, and the third year, up to the time of the discovery, the sums misappropriated aggregated $36,050, making, according to these figures, a total during the three years of at least $63,563. The discovery was made in November, 1903, and in August, 1904, the bank brought suit against the guaranty company, seeking to recover as much of the defalcation as was covered by the bond, the penalty of which was $10,000. In April, 1905, while that suit was pending, the guaranty com-

pany filed its bill of complaint now under consideration, on the ground that its defense to the suit of the bank was not available at law. Appellee answered and filed a cross-bill, praying that the amount due it on the bond be ascertained and for a judgment or decree for such amount. The guaranty company offers to pay for so much of the defalcation as occurred the first year, while the original bond was in force, but it seeks to avoid liability for losses which occurred during the two subsequent years covered by renewals."

Judah, Willard, Wolf & Reichmann, for appellant.

Newman, Northrup, Levinson & Becker, and Chester E. Cleveland, for appellee.

Mr. Justice Vickers delivered the opinion of the court:

Appellant contends that the two certificates made by the bank to obtain a renewal contain false representations which render the certificates void, and that therefore the bond was not in force except for the first year. The charge of false representations raises an issue of fact. The burden of proof upon that issue is upon appellant.

In the two renewal certificates in question, both of which were alike in form, the president of the bank certifies to the company that the books and accounts of the cashier "were examined by us from time to time in the regular course of business, and we found them correct in every respect, all moneys handled by them (him) being accounted for." Appellant's contention is, that the statement that the books and accounts of Wright had been examined was not true; that if an examination had been made the embezzlements of the cashier would have been discovered, and that the fact that they were not discovered is proof that no examinations were made. Appellant further contends that the renewal certificates extending the original bond for the second and subsequently for a third year were issued by appellant in reliance

upon the representations contained in the certificates in question.

The bond in question must, we think, be regarded as an insurance contract, and as such subject to the rules of construction applicable to insurance policies generally, and not the rules applied to ordinary sureties for accommodations. (*People* v. *Rose,* 174 Ill. 310.)  In this case this court, on page 313, said: "Guaranty insurance is, in its practical sense, a guaranty or insurance against loss in case a person named shall make a designated default or be guilty of specified conduct.  It is usually against the misconduct or dishonesty of an employee or officer, though sometimes against the breach of a contract.  This branch of insurance is so much more modern in origin and development than fire, marine, life and accident insurance that there are few decisions upon the subject, but the business is gradually increasing and is doubtless destined to take an important place in the commercial world.  It may be confidently stated, notwithstanding the comparative absence of specific decisions, that the general principles applicable to other classes of insurance are applicable here as well.  Thus, the general doctrine of warranty, representation and concealment, as applied to fire, life and marine insurance, is applicable also to the subject of guaranty insurance."

Contracts of guaranty insurance are made for the purpose of furnishing indemnity to the assured, and they should be liberally construed to accomplish the purpose for which they were made.  (*American Surety Co.* v. *Pauly,* 170 U. S. 133; *Guaranty Co.* v. *Mechanics' Savings Bank and Trust Co.* 80 Fed. Rep. 766.)  The law is well settled, in its application to insurance contracts, that a misrepresentation of a material fact, in reliance upon which a contract of insurance is issued, will avoid the contract, and it is not essential, in equity, that such a misrepresentation should be known to be false.  A material misrepresentation, whether made intentionally and knowingly or through mistake and in good

233—31

faith, will avoid the policy. (May on Insurance, sec. 181.) We think there can be no doubt that the representations upon which appellant relies were material. The points covered by the certificate of the president were particularly required by appellant's letter. The request of appellant for information upon these points makes the answer material. (May on Insurance, sec. 185.) The rights of the parties therefore depend upon whether the representations were true or false.

By reference to the certificates in question it will be seen that the statement "that the books and accounts * * * were examined by us" is followed by the qualifying phrase, *"from time to time in the regular course of business."* There is here no statement of the character of the examinations or the frequency with which they were made. There is nothing in the original bond or in the renewal certificates that required appellee to make examinations at stated times or in a particular manner. The character of the examinations and the frequency with which they were made are governed by "the regular course of business" of appellee. The evidence shows that the bank was opened for business about the first of January, 1901, with a capital stock of $50,000. Soon after the bank opened it was examined by Mr. Cook, national bank examiner for Illinois, and he testifies that the bank was duly and properly organized and that the books of the bank were properly kept. The examiner testifies, also, that on the occasion of his first examination he made careful inquiry concerning the character of the cashier and his fitness for the position, and received nothing but favorable information. It is shown that the bank was examined, under the direction of the comptroller, subsequently, in the years 1901, 1902 and 1903. The bank examiner testifies that he made a careful and thorough investigation in accordance with the usual custom and practice of national bank examiners, and found nothing irregular until the defalcation was discovered, in the latter part of

1903. It was also shown that the bank had a discount committee, composed of three members of its board of directors, and that this committee performed the usual duties devolving upon such committees. The discount committee held frequent meetings in the bank, examined the books and the notes and found no irregularities. During the first year the bank discounted 739 items that were entered upon the books. All of these items were *bona fide* transactions and regularly entered, in due course of business, on the books of the bank, except one item of June 6, 1901, which was Wright's personal note, which he discounted and entered on the discount register correctly as a note for $300.. The cash book, however, showed that the bank had paid out on that day $3000 by a draft on Chicago, payable to the order of E. Lynn. This was the first embezzlement committed by the cashier, and the only one during the first year. It appears that the note for $300 was paid in April, 1902, after the first certificate in question was made by the bank. The method adopted by Wright to conceal his embezzlement in this instance was subsequently followed in all of his later embezzlements. He would make his own note to the bank for a small sum and enter it correctly on the discount register; then he would draw a draft on Chicago or New York for ten times the amount of the note and enter the draft on the cash book corresponding to the number in the discount register of the note discounted. By this method the cash book would balance correctly and the discrepancy would not appear unless the cash book and the discount register and the notes discounted were compared with each other.

The only irregularity in the entire year's business of 1901 consists in one additional cipher being added to the figures "300" on June 6. Appellant insists that the failure of the bank to discover this discrepancy is conclusive proof that no examination was, in fact, made. This conclusion is not warranted by the facts and circumstances in this record.

If it be assumed that an examination of the bank's books means only such a thorough and exhaustive examination as would necessarily discover the slightest irregularity that might exist, however cunningly covered up, then, of course, appellant's contention would be sound; but this is manifestly not the meaning of the word "examination" in the certificates in controversy. If bank officers are to be held to such a rigid method of examination and supervision over the accounts of their employees there would be but little necessity, if any, for purchasing fidelity insurance. When a trusted employee conceives a scheme of criminal misappropriation of his employer's money, he at the same time matures his plans for covering up his wrongdoings. He has many advantages over his employer, since he knows what the real facts are and is therefore always on his guard to allay suspicion, while the employer is ignorant of the real facts and therefore unsuspecting. In this case the evidence shows that the defaulting cashier had an unquestioned reputation for honesty and fidelity, and not the least suspicion existed that he was not entirely honest and worthy of the confidence reposed in him. The bank examiner for the government had examined this bank time and again and found nothing to arouse his suspicions. Under these circumstances the fact that the officers of the bank failed to discover the additional cipher added to the figures "300" among 738 other items on the same book falls very far short of proving, or even tending to prove, that there was no examination, in fact, made by the officers of this bank within the meaning of the certificates in controversy.

We have so far confined our discussion of this subject to the conditions as they existed when the first certificate was made, in January, 1902. If the certificate made at that time contained no false representations entitling appellant to the relief sought, it is not necessary to consider the evidence relating to the certificate made in January, 1903. If the renewal certificate of 1902 is binding upon appellant and

had the effect of continuing the bond in force for that year, then appellant is liable for the full amount of the decree below, since it is admitted that Wright's embezzlements during the year 1902 were largely in excess of the face of the bond. If appellant's contention as to the construction of the certificates be sustained, the result would be that the making of such a certificate would be an acquittance and release of the insurance company of all liability that existed on account of the infidelity of the employee prior to the date of the certificate. That such is not the construction put upon these certificates by the parties is shown by the limitation clause, which allows one year after the expiration of the bond in which to discover the misconduct of the employee for whose fidelity the insurance policy is procured. It is probably true that an expert accountant, in making a thorough and detailed examination into the affairs of this bank, might have discovered the irregularity of June 6, 1901; but the officers of this bank were not required by any clause in the contract to make any such examination as above supposed, and the certificate to the effect that the books and accounts of Wright had been examined from time to time, in the regular course of business, and found correct, carried no assurance to appellant that such examinations had been made. That the president and discount committee had from time to time, in the regular course of business, examined the books and accounts of the bank and found them correct cannot be disputed under the evidence in this record. We therefore agree with the conclusion of the trial court and the Appellate Court that the certificate of January 22, 1902, was substantially true. It results from this conclusion that the decree below and the judgment of the Appellate Court should be affirmed unless the court erred in not awarding appellee a decree for $20,000.

We do not think that the cross-errors can be sustained. The renewal certificate contains this provision: "Provided the aggregate liability of the United States Fidelity and

Guaranty Company from the date of the issuance of said schedule bond to the date of the expiration of this certificate, for or on account of any act or acts of any one of said persons, shall not exceed the sum written opposite that person's name upon the attached schedule." Appellee contends that each renewal of the bond was equivalent to the issuing of a new contract, and that it is entitled to recover $10,000 on the renewal for the year 1902 and $10,000 on the renewal for 1903. Appellee and appellant occupy a novel situation in respect to the $3000 embezzled in 1901. Appellant's contention is that there is but one contract, and that the renewals merely continued that contract in force for the time covered by the renewal certificates. This being true, appellant concedes that each renewal would extend the limitation in which the liability was to be discovered, one year from the time when the renewal expired. Appellant therefore admits its liability to the extent of $3000 and offers to pay that amount. On the other hand, appellee contends that each renewal constitutes a new contract and that the limitation commenced to run on the bond of 1901 at the date of its expiration, and that the embezzlement of June 6, 1901, not having been discovered by the bank until in November, 1903, the company is not liable to appellee for that item. Thus we have the appellant admitting its liability and offering to pay $3000 to appellee, and appellee trying to convince us that appellant is mistaken about its liability under the contract of 1901 for this item. Under the view we take of this case it is not necessary for us to decide which of these parties has made the better case for the other. In our opinion the clause above quoted from the renewal certificate precludes appellee from recovering more than the face value of the original bond, together with the interest thereon.

The judgment of the Appellate Court for the First District is affirmed.                    *Judgment affirmed.*