## ÆTNA CASUALTY & SURETY CO. v. COMMERCIAL STATE BANK OF RANTOUL.

(District Court, E. D. Illinois.  June 11, 1926.)

**1. Insurance ⬤═2—Surety bond, given to assure fidelity of bank cashier, is insurance contract.**

A bond given by a surety company to a bank, in consideration of a premium or premiums paid, to indemnify the bank against loss through any dishonest or criminal act or omission of its cashier is an insurance contract, subject to the rules of construction of insurance policies generally and not to the rules governing ordinary contracts of suretyship for accommodation.

**2. Insurance ⬤═508½—Fidelity bond for bank cashier, renewable annually, is separate contract for each year of renewal to extent of penalty named, regardless of liability incurred thereunder in previous years.**

A bond given by a surety company to a bank to assure fidelity of its cashier, in consideration of a premium paid, which kept it in force for one year, but renewable from year to year, is in effect a separate contract for each year of renewal, and binds the surety company to indemnify the bank for losses in any one of such years, to the extent of the penalty named, regardless of the amount of any liability incurred thereunder in previous years.

**3. Insurance ⬤═430—Surety company held liable on bond given for fidelity of bank cashier, where he abstracted funds and substituted notes given for bank's accommodation.**

Under a surety bond to indemnify a bank for losses through dishonesty or fraud of its cashier, including money for which the bank should be legally liable, where the cashier secured accommodation notes to the bank from directors and stockholders, ostensibly to be used only as collateral to the bank's own notes for money borrowed, but converted money of the bank to his own use and substituted such notes as assets, the liability of the bank to the makers was within the terms of the bond.

**4. Insurance ⬤═146(3)—Words defining liability in surety bond to be given broad meaning; "fraud;" "dishonesty."**

In a bond given by a surety company to a bank to indemnify it for loss through the fraud or dishonesty of its cashier, the meaning of the words "fraud" and "dishonesty" and similar words extends beyond acts which would be criminal, and the words are to be given a broad meaning and taken most strongly against the surety company.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Fraud; Second Series, Honesty.]

**5. Evidence ⬤═508—Insurance ⬤═648(2)—In action against surety of bank cashier, his records, reports, and statements, and conclusions of experts from records and reports, held admissible.**

In an action against the surety on the bond of a bank cashier records kept by him and reports made by him, while the bond was in force, and also statements made by him in the course of performance of his duties, and conclusions

of expert witnesses from his reports and records, are admissible against his surety.

In Equity. Suit by the Ætna Casualty & Surety Company against the Commercial State Bank of Rantoul. Decree for defendant on its cross-demand.

Acton, Acton & Snyder, of Danville, Ill., for plaintiff.

Gunn, Penwell & Lindley, of Danville, Ill., and Dobbins & Dobbins, of Champaign, Ill., for defendant.

LINDLEY, District Judge. Originally defendant brought suit at law against the plaintiff to recover upon a surety bond of $10,000 dated December 23, 1920, and effective January 1, 1921, indemnifying the defendant against the fraud or dishonesty of its cashier, one Robinson, as hereinafter set forth. Three annual premium payments were averred to have been made in due course, and defendant sought to recover for losses in each of the three years, 1921, 1922, and 1923. Plaintiff thereupon filed its bill in equity, herein, seeking an injunction against the suit at law, a discovery, an accounting, and a final adjudication upon the questions and amounts of liabilities. The defendant filed its answer, presenting what it claimed to be a true accounting, and, by way of petition for affirmative relief, repeated its averments of the suit at law, seeking to recover judgment against plaintiff as surety upon said bond.

At the outset we meet the question of whether defendant's right to recover, if it has one, is limited to the amount of $10,000 or to that of $10,000 for each of three years. The bond provided that, in consideration of an annual premium of 25 cents per $100 of liability, the plaintiff was bound to pay to defendant such pecuniary loss as the defendant should sustain of money or other personal property, including that for which defendant should be legally liable, through the fraud, dishonesty, theft, embezzlement, wrongful abstraction, misapplication, or misappropriation or any other dishonest or criminal act or omission of the cashier, while the latter held his position, "during the term commencing with the 1st day of January, 1921." Liability was conditioned upon defendant giving plaintiff notice of loss promptly, upon discovery thereof, and filing with plaintiff within three months thereafter itemized statement of claim. Either party was permitted to terminate the agreement by giving thirty days' notice of such

desire. No liability attached for losses not discovered within two years after the termination of the bond. Three annual premiums were paid, and defendant is claiming for losses occurring in each of the three years, 1921, 1922, and 1923, aggregating over $30,000. Plaintiff contends that the proper interpretation of this agreement is that the total liability cannot exceed the penalty of the bond, $10,000, that the parties intended that there should be one contract, affording insurance of $10,000 for the entire period, irrespective of how many years the premiums should be paid, and that there was not insurance of $10,000 for each year in which a premium was paid.

[1] The bond must be regarded as an insurance contract, subject to the rules of construction applicable to insurance policies generally, and not to the rules applied to ordinary sureties for accommodations. The governing law is that of insurance, not that of suretyship. People v. Rose, 174 Ill. 310, 51 N. E. 246, 44 L. R. A. 124; U. S. Fidelity Co. v. First National Bank, 233 Ill. 475, 84 N. E. 670; Guarantee Co. v. Bank, 80 F. 766, 26 C. C. A. 146. Contracts of insurance guaranteeing honesty and fidelity are made for the purpose of furnishing, for an adequate compensation, indemnity to the insured, and should therefore be liberally construed to accomplish the purpose for which they are made. American Surety Co. v. Pauly, 170 U. S. 133, 18 S. Ct. 552, 42 L. Ed. 977; Guarantee Co. v. Bank, 80 F. 766, 26 C. C. A. 146; U. S. Fidelity Co. v. Bank, 233 Ill. 475, 84 N. E. 670.

[2] Here defendant paid an annual premium for insurance. Under plaintiff's theory, if there were a loss of $10,000 the first year, not discovered until the end of the three years' period, then, though defendant had paid premiums for the second and third years, it would have no protection for those years, no insurance, for the reason that the penalty of the bond would be completely exhausted by the first year's losses, and nothing would remain to cover losses in the second and third years. In such case, the second and third years' premiums would be paid by defendant for nothing whatever. No sane man would say that this was the intention of defendant, and the court is most loathe to believe that it was the intent of plaintiff, a widely known insurance company, dependent upon the good will and esteem of the public and its customers for its commercial welfare, so to frame its contract of indemnity as to extract premiums from

the insured without giving anything in return. Brief indeed would be its life of business prosperity and public esteem, were it known that it would be guilty of such a game of "heads I win, tails you lose." Rather than impute to it such an abhorrent suggestion of lack of commercial integrity and fair dealing, the court prefers to find as he believes the facts clearly indicate, that each year's premium was to buy one year's insurance of $10,000. There is no fact or circumstance warranting a finding that the parties intended that the first year's premium bought insurance of $10,000, but that the three years' premiums bought insurance of only $3,333⅓ per year.

In this respect the court finds itself in accord with the well-considered cases upon the subject. In Maryland Casualty Co. v. Bank, 246 F. 892, 159 C. C. A. 164 (certiorari denied 246 U. S. 670, 38 S. Ct. 345, 62 L. Ed. 931), the court, in considering a bond which mentioned the date of commencement of liability, but not expressly the date of its termination, said: "The contract made by the delivery and acceptance of the policy with the rider attached stated in the body of it the date of the commencement of the period within which the losses insured against must occur or have occurred. The policy recited that its consideration was 'a premium, payable in advance, based upon an annual rate per hundred dollars of suretyship.' * * * That contract was what is known in the insurance business as a 'term policy,' under which the insurance contracted for covers only losses occurring before the expiration of the stated term. Further action of the parties, having the effect of creating a new contract, was required to make the defendant liable for any loss or losses occurring after January 10, 1914. Such further action, if taken, would not, in the absence of a stipulation to that effect, either increase or diminish the amount for which the insurer, under its original contract, had already become liable in consequence of losses incurred during the period covered by that contract, though such losses had not been discovered when a new contract was made having the effect of insuring against losses occurring in a later period." Other cases that support this reasoning are Procter Coal Co. v. U. S. F. & G. Co. (C. C.) 124 F. 424; Fla. Cent. & P. R. Co. v. A. Surety Co., 99 F. 674, 41 C. C. A. 45; De Jernette v. Fidelity Co., 98 Ky. 558, 33 S. W. 828; Long v. U. S. F. & G. Co., 130 Mo. App. 421, 110 S. W. 29; Bank v. Bonding Co., 194 Mo. App. 224, 187 S. W. 99; U. S. F. & G. Co. v. Williams, 96 Miss. 10, 49 So. 742; Hawley v. U. S. Fid. Co., 100 App. Div. 12, 90 N. Y. S. 893, affirmed by Court of Appeals in 184 N. Y. 549, 76 N. E. 1096; Maccabees v. Surety Co., 196 Mich. 27, 163 N. W. 7; Brady v. Insurance Co., 11 Mich. 425; Danvers Sav. Bank v. National Surety Co., 166 F. 671, 92 C. C. A. 423, and cases cited in 25 C. J. § 16, pp. 1109 and 1110. Courts in which an opposite conclusion has been reached have grounded their decisions upon a finding that the parties by their contract evidenced an intention to restrict the liability to one penalty without regard to the number of premiums paid. The court has discovered nothing in this record to warrant such finding.

It may well be that the contract is a continuing one. Whether a formal new contract is made at the end of the year, however, is manifestly not the test. The coal jobber who has a contract for the purchase of certain of the output of a mine from month to month, or year to year, has one continuing contract, but each payment of the prescribed price buys an additional ton of coal. The continuity of the contract has no bearing except to fix the prices. So the question here is, What did the defendant buy the first year, what did he buy the second year, and what did he buy the third year? When the first year ended, all future liability of plaintiff was at an end, unless and until another year's premium—the same as, or, as here, more than, had been paid the first year—should be paid. By the payment of that premium and its acceptance the plaintiff said as plainly as if it had made a new bond, that it, in consideration for the premium, would stand for the same insurance for that year as it had for the first. Any other conclusion arises from a false conception of the situation and relations of the parties.

[3] The claims of defendant rest chiefly upon certain accommodation notes, executed by various stockholders and directors, aggregating $34,500. Each of these notes was signed at the request of Robinson, the cashier, in most instances in the presence only of the signer and the cashier, upon an agreement that the total would be approximately $10,000, and that they were to be used only as collateral to the Commercial State Bank's notes for loans procured from corresponding banks, such as the First National Bank of Champaign. The makers, in most instances, signed on the first line for signatures, being

informed that other accommodation signers were to sign below. In this manner the total amount of notes was procured. It was agreed that the makers would be under no liability to pay either the principal or interest of the notes, which were not to be assets of the bank, were without consideration, so far as the bank was concerned, and were purely accommodation paper. These notes bore dates prior to January 1, 1921, but, with three exceptions, the thirteen makers testified that they made the agreement with Robinson and signed the notes, at various dates after January 1, 1921. It is apparent from the testimony that Robinson had previously written up the notes and had them ready to be signed as opportunity afforded to work out his scheme. The other three makers testified that they made their agreement and signed the notes shortly before or just about the time the state bank began doing business. The record is plain that the organization of the bank occupied several weeks, and that in each of the connections Robinson was acting as the representative of the state bank, which was completely organized, at least, as early as January 3, 1921.

When the bank closed in August, 1923, upon the disappearance of Robinson, each of these notes, or renewals of same, without the knowledge or consent of the makers, appeared on the records of the bank as a part of the assets, having been entered upon the records by Robinson or by his subordinate employees, at his direction. The exact times at which they were converted is a controverted question, the plaintiff now claiming that they were a part of the assets of the bank at the time of its opening on January 3, 1921, and that the conversion, therefore, occurred before the indemnity bond became effective. Without attempting to recite the voluminous testimony offered by the parties upon this question, after a careful consideration of the same, the court is of the opinion that the evidence clearly supports defendant's contention that the respective dates upon which Robinson converted the respective notes and entered them as assets of the bank were as follows: Charles R. Blood note, January 26, 1921, $3,000; F. L. Evans note, June 18, 1921, $3,000; Les McCabe note, November 27, 1921, $3,600; the Walsh, Campbell, Burke, Britt, New, Jackson, Flagg, and Pilgrim notes, aggregating $24,-900, at various dates between January 3, 1922, and May 19, 1922; the Malloy note, $2,500, in 1923. The plaintiff, though it now takes a contrary position, in its original bill under oath set out in detail losses of the amounts of various of these notes to the bank on various dates between March 7, 1921, and May 17, 1922, aggregating $35,-000.

[4] The only reasonable inference to be drawn from the evidence is that upon the respective dates of the conversions Robinson abstracted funds or securities from the bank, converting them to his own use, and substituted the accommodation notes. Thus the losses to the bank accrued upon the respective dates of the conversions and substitutions. But if we were not to draw the necessary inference mentioned, the evidence plainly discloses acts of the cashier within the terms of the bond. As cashier, by some means he got into the bank, as assets for creditors, notes which were, so far as the makers were concerned, without consideration. For these notes thus converted, he thereby created a liability upon the bank to the respective makers. Through his fraud and dishonesty there came into existence simultaneously with his acts inescapable liabilities and losses to the bank, covered by plaintiff's indemnity agreement. The language of the Court of Appeals for the Eighth Circuit in U. S. F. & G. Co. v. Egg Shippers' & F. Co., 148 F. 353, 78 C. C. A. 345, is applicable here: "Another clause of the bond provided that its true intent and meaning was that the defendant should be responsible only 'for moneys, securities, or property diverted from the employer through fraud or dishonesty on the part of the employé.' In other words, defendant contends that no fraud or dishonesty of Boardman was shown. We are at a loss how to characterize his conduct if it was not both fraudulent and dishonest. The test is not whether he intended to personally profit by his course, though that he did is perhaps a permissible inference from the facts shown. He occupied a position of trust and confidence which he secretly betrayed. He received compensation for guarding the interests of his employer, and he was willfully, intentionally, and grossly faithless. This is not a case of mere indiscretion or error of judgment. There was a breach of trust, a want of financial integrity, coupled with deceit and concealment, and resulting in financial loss to the employer. This was both fraud and dishonesty within the meaning of the bond. * * * In the bond before us the terms 'fraud' and 'dishonesty,' while relating to pecuniary matters, are employed in a broader and more comprehensive sense.

They are not restricted to such conduct as imports a criminal offense. An act entailing a financial loss to another may be both fraudulent and dishonest, and yet not fall within the definitions of embezzlement and larceny." "The meaning of fraud and dishonesty extends beyond acts which would be criminal."

See Citizens' Trust Co. v. Globe, etc., Ins. Co. (C. C. A. 4th) 229 F. 326 at 330, 143 C. C. A. 446, 450 (Ann. Cas. 1917C, 416). The word "dishonesty" is to be given a broad significance and taken most strongly against the surety company. Trust Co. v. Lee, 204 Ill. 69 at 71, 68 N. E. 485; Citizens' Trust Co. v. Globe, etc., Ins. Co., supra.

In addition to the claims already considered, defendant insists upon one item of $1,700 known as the Blood note, and one item of interest of $60, another of $30 and $450 credited to Robinson's funds. The evidence amply sustains each of these claims. Robinson collected a note of $1,700, from Charles R. Blood, and misapplied the funds to his own credit; he did the same with the two items of interest and the proceeds of a draft for $450. Of these misapplications $2,280 occurred in 1923 and $60 in 1922.

[5] Many of the records and much of the testimony offered by defendant was objected to by the plaintiff. The records kept by Robinson after the bond was given, and the reports made by him, and the conclusions of the expert witnesses therefrom, are clearly competent, as are also the entries in his official records in his hands at the date of the bond. Roper v. Sangamon Lodge, 91 Ill. 518, 33 Am. Rep. 60; Town of Cicero v. Grisko, 240 Ill. 220, 88 N. E. 478, and cases there cited. The statements of Robinson, during the existence of the bond, are binding upon the plaintiff, his surety. See Scovill Mfg. Co. v. Cassidy, 275 Ill. 462 at 469, 114 N. E. 181, 185 (Ann. Cas. 1918E, 602), where the court says: "The general rule is that, where the declarations or admissions of the principal are made in the course of the performance of the business for which the surety or guarantor is bound, they are evidence against the surety or guarantor, * * * where the principal is not a party to the suit, his declarations are not admissible unless they are made while in the employment in which the principal was engaged. The statements or admissions, to be competent against the guarantors, should be made during the continuance of the interest involved and not after that interest has ceased."

In the case of Cicero v. Grisko, the Supreme Court of Illinois made use of certain language that would render competent the books and records of the predecessor bank, but, in view of the decisions of National Bank of Pawnee v. Hamilton, 202 Ill. App. 516, 520; Leiserowitz v. Fogarty, 135 Ill. App. 609, and other authorities cited by plaintiff, there is so much doubt cast upon the admissibility of such evidence that the court has endeavored to decide the issues herein involved exclusive of same. Logically the records of the predecessor of the defendant should be admissible, in view of the fact that the one purchased and succeeded to the assets of the other; that continuity of title and privity of ownership existed between the two; that the same cashier and subordinates made the records and kept them in the same manner in the usual course of business. These features apparently would remove the objection that such records are res inter alios acta.

Discovery of the losses incurred by the bank did not occur until Robinson absconded in August, 1923. Prompt notice was given the plaintiff, and defendant has complied with all conditions precedent prescribed in the bond. Defendant is entitled to recover all the losses incurred in 1921, $9,600, such part of the losses in 1922 as are embraced within the penalty of $10,000 and for all the losses of 1923, $4,740, or a total of $24,340, together with interest at 5 per cent. per annum from January 15, 1924, this being the expiration of the two months period, following receipt of the proof of loss, allowed by the bond for payment by plaintiff.

Proper decree for said amount, interest, and costs in favor of defendant and against plaintiff may be submitted.