SANTA FE GENERAL OFFICE CREDIT UNION, Plaintiff-Appellant, *v.* GOTTAR A. GILBERTS, Defendant—(NATIONAL SURETY CORPORATION, Defendant-Appellee.)

(No. 56177;

First District (1st Division)—May 29, 1973.

*Rehearing denied July 26, 1973.*

William J. O'Brien, of Chicago, for appellant.

Edward P. McNeela and John P. Hampton, both of Chicago, (Dent, Hampton & McNeela, of counsel,) for appellee.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

The legal problems to be unraveled here stem from a most unfortunate series of defalcations from a credit union by a trusted fiduciary and officer. Suit was originally filed by Sante Fe General Office Credit Union (plaintiff) against its former treasurer, Gottar A. Gilberts (defendant), and also against National Surety Corporation (National) which had acted as surety on his official bonds. In addition, National filed a counterclaim seeking indemnity against defendant.

Plaintiff filed motions for summary judgments against defendant and National. These motions were denied. National filed a motion for partial summary judgment limiting plaintiff's recovery. The trial court granted National's motion and limited plaintiff's recovery against National to $10,000 plus interest. Judgment was accordingly entered in favor of plaintiff and against National in the amount of $12,629.11. Defendant stipulated to a judgment in favor of National and against himself on National's counterclaim in the amount of $12,629.11. The court heard the evidence on the balance of the claim and entered judgment in favor of plaintiff against defendant in the amount of $252,437. This represented amounts actually embezzled $176,081.60; interest thereon of $51,355.40 and also $25,000 for punitive damages. Apparently the embezzled amounts have been entirely dissipated and the judgments against de-

fendant remain unsatisfied. Plaintiff appeals from the partial summary judgment in favor of National limiting National's liability to $12,629.11 and from the order denying plaintiff's motion for summary judgment against National in the amount of $144,092.45 plus interest and costs. The divergent contentions raised by plaintiff and National will have greater significance if set forth after the following statement of fact.

Defendant was first elected treasurer of plaintiff organization on February 23, 1946. He held this office, with re-election on an annual basis, until 1965. His first embezzlement took place in 1948. He misappropriated plaintiff's funds in varying amounts thereafter during each and every year without exception until and including 1965. The smallest amount taken was in 1955 in the amount of $4710 and the largest thefts occurred in 1953 in the total amount of $17,890. Plaintiff contends that the total amount of these defalcations was $192,617.45. However, defendant made some repayment of funds from time to time perhaps in an effort to lay the foundation for additional misappropriations. This amounted to $16,535.85 leaving a net amount abstracted of $176,081.60. These various shortages were confirmed by adequate accounting procedures.

The relationship between plaintiff and National commenced in 1946 with the execution of a position schedule bond bearing National's Identification No. 862703. This bond is dated February 28, 1946. It covered loss of money for dishonest, fraudulent or criminal acts committed by employees of plaintiff while occupying any position designated in the bond. There is a provision that such losses are to be reported to National in writing within 15 days after discovery by plaintiff and "within three years after termination of coverage on the employee causing the loss * * * ."

Various schedules were subsequently appended to this bond setting forth the positions covered, the amount of liability of National as to each position and the amount of premium charged in each instance. After the initial year, each of these schedules provided, "That this schedule supersedes all prior schedules attached to the bond * * * ." The original schedule dated February 28, 1946, also provided:

"The amount of coverage on each such position is the amount stated in the appropriate schedule or endorsement. Any such amount may be changed by endorsement, or by naming a different amount in a new schedule identified as aforesaid and attached as of any anniversary date."

The original schedule also provided:

"The coverage on any position for separate periods shall not be cumulative as to any occupant, but the full amount of coverage

shall be available for losses caused by each different occupant of the position."

Each of the subsequent schedules further provided:

"* * * the coverage on each employee is continuous from its inception to its termination, and the coverage for separate periods shall not be cumulative; that if the coverage on any employee for separate periods be for different amounts, the maximum liability of the Corporation for all defaults of that employee shall be governed by the provisions of the bond, and shall in no event exceed the largest amount of coverage in force during any period within which defaults shall have occurred, nor shall the coverage for one period be available for defaults occurring within any other period."

The positions originally noted in the first schedule were president, vice president, treasurer, secretary and messenger. The designated liability in connection with the position of treasurer, occupied by defendant, was $5000. The three remaining officers had liability limits of $1000 each and the liability as regards the position of messenger was limited to $500. Total premium for all of these positions was $15, with $7.50 thereof being allocated to defendant's position.

All subsequent schedules as issued and attached to this same fidelity bond bearing No. 862703 set out the position in question, the amount of the liability assumed by National, and the premium charged. The provisions thereof remained unchanged as above noted. There were minor variations in that the position liability as regards plaintiff's president was increased to $2000 during 1951 with an additional premium being charged for the increase. Also, the position liability as regards defendant was increased first to $6000; and, in 1952, to $10,000. The annual premium for this last increase became $15 and the total premium charged by National that year was $24.

As regards the varying amounts expressed in the position bond, during each year, defendant made an annual report under oath to the Auditor of Public Accounts of Illinois in which he set forth the total assets of plaintiff. During the years from 1946 to and including 1957, in which this position bond remained in effect, the assets of plaintiff as thus reported by defendant varied from $27,143.65 in 1948 to $41,352.45 in 1957. During each of these years, the Auditor had issued schedules indicating minimum bond requirements for credit unions. For the years 1948 to and including 1957, this official minimum requirement for defendant's bond as Treasurer of plaintiff Credit Union was $6000. As above indicated, the minimum of the treasurer's bond was fixed by the Auditor at $6000 from 1948 to and including 1957. However, from

1948 to 1951 inclusive, the bond actually remained at this level; but, from 1952 to 1957 inclusive, defendant's bond was given in the amount of $10,000. Thus, from 1952 to and including 1957, the schedules reflected an increase in the liability on the bond to $10,000. In each instance, the board of directors of plaintiff duly approved these expressed amounts of coverage on defendant's bond. Ill. Rev. Stat. 1951, ch. 32, par. 8. See also Ill. Rev. Stat. 1955, ch. 32, par. 13.

During the latter part of 1957, the Auditor of Public Accounts requested a change in the type of bond then being used. This change was not initiated or requested by plaintiff or by National but . originated entirely from the Auditor's office. The Auditor required that plaintiff obtain a blanket bond and that the surety on the bond notify the Auditor when this had been issued, with information as to the date and number of the bond. This request was made in writing and also contained a direction that plaintiff was required to obtain a blanket bond in the sum of not less than $8000.

Accordingly, plaintiff made a written application to National for the issuance of a blanket bond to be effective February 28, 1958, in the amount of $8000. This bond was actually executed by National and bears No. 3065971. The pertinent provisions thereof will shortly be stated. This type of blanket bond remained in full force and effect until June 1, 1965. In 1958, it was in the amount of $8000; but, upon each and every annual renewal thereafter, the coverage on this blanket bond was raised to $10,000 and it remained in that amount to and including June 1, 1965. The Department of Financial Institutions and plaintiff and National treated this blanket bond as being renewed each year.

During each year in which the position bond and the blanket bond remained in force and effect, they were always in form and amount approved by the Auditor of Public Accounts, or, in later years, by the Director of Financial Institutions. As we will later observe, plaintiff claims that neither the position bond nor the blanket bond were in proper statutory form and that the Auditor or the Director therefore could not legally approve them. This contention, however, does not modify the fact that the Auditor and the Director actually did approve both of these bonds as to form and amount. In addition, the amount specified in both bonds originally as well as the amounts reflected in all of the annual schedules of the position bond and all renewals of the blanket bond were approved by the directors of plaintiff.

This blanket bond provided that by acceptance thereof plaintiff gave notice of termination or cancellation of the prior position schedule bond bearing No. 862703 becoming effective as of February 28, 1958, the commencement date of the new blanket bond. The blanket bond also

contained a paragraph headed "Indemnity Against Loss Under Prior Bond Or Policy." This provided as follows:

"If the coverage of this bond is substituted for any prior bond or policy of insurance carried by the Insured or by any predecessor in interest of the Insured which prior bond or policy is terminated, cancelled or allowed to expire as of the time of such substitution, the Underwriter agrees to indemnify the Insured against loss sustained by the Insured and discovered as aforesaid and which would have been recoverable by the Insured or such predecessor under such prior bond or policy except for the fact that the time within which to discover loss thereunder had expired: PROVIDED: (1) the indemnity afforded by this paragraph shall be a part of and not in addition to the amount of coverage applicable to such loss or losses under this bond; and (2) such loss or losses would have been covered under this bond, had this bond with its agreements, limitations and conditions as of the time of such substitution been in force when the acts or omissions or casualty or event causing such loss or losses occurred; and (3) recovery under this bond on account of such loss or losses shall in no event exceed the amount which would have been recoverable under the coverage applicable to such loss or losses under this bond in the amount for which such coverage is written as of the time of such substitution, had this bond been in force when such acts or omissions or casualty or event occurred, or the amount which would have been recoverable under such prior bond or policy had such prior bond or policy continued in force until the discovery of such loss or losses if the latter amount be smaller."

The blanket bond also contained a provision entitled "Non-Reduction of Liability" containing language as follows:

"Section 6. Payment of loss under this bond shall not reduce the liability of the Underwriter under this bond for other losses whenever sustained; PROVIDED, however, that the total liability of the Underwriter under this bond on account of * * * (c) any loss or losses * * * caused by acts or omissions of any person (whether one of the employees or not) or acts or omissions in which such person is concerned or implicated, * * * is limited to the sum above stated in the opening paragraph of this bond, irrespective of the total amount of such loss or losses."

In addition, the blanket bond further provided:

"Non-Accumulation of Liability

Section 7. Regardless of the number of years this bond shall continue in force and the number of premiums which shall be

payable or paid, the liability of the Underwriter under this bond with respect to any loss or losses specified in the PROVIDED clause of Section 6 of this bond shall not be cumulative in amounts from year to year or from period to period."

Neither the original position schedule bond nor the original blanket bond specified a date for termination thereof. They were each renewed upon their annual anniversary dates by a schedule or an application form executed by plaintiff and National. Separate premiums were paid each year on both bonds.

Defendant commenced his defalcations in 1948. This course of conduct continued until 1965. Plaintiff first ascertained the existence of these losses during May of 1965. It is agreed that plaintiff filed timely and proper proof of loss with National on November 19, 1965. The amounts of the abstractions by defendant have been broken down upon an annual basis and they are as follows:

| Stolen 1948-1957 Inclusive (Position Bond) | | Stolen 1958-1965 Inclusive (Blanket Bond) | |
|---|---|---|---|
| 1948 | $ 6,300.00 | 1958 | $ 6,670.00 |
| 1949 | 10,815.00 | 1959 | 9,425.00 |
| 1950 | 13,455.00 | 1960 | 10,180.00 |
| 1951 | 16,230.00 | 1961 | 10,995.00 |
| 1952 | 17,040.00 | 1962 | 11,885.00 |
| 1953 | 17,890.00 | 1963 | 12,825.00 |
| 1954 | 12,480.00 | 1964 | 12,120.00 |
| 1955 | 4,710.00 | 1965 | 7,382.45 |
| 1956 | 5,935.00 | | |
| 1957 | 6,290.00 | | |

This blanket bond was renewed each year upon its expiration and premiums were paid upon an annual basis. In February of 1963, the premium was prepaid for three years. As in the case of the position bond, the premium was based upon the amount of assets handled by defendant. Premiums in the appropriate amount of $70.00 were paid each year by plaintiff. Each annual renewal was effected by a separate application form requested by National and executed by plaintiff.

It is plaintiff's basic contention that it is entitled to a summary judgment against National on the total aggregate amount of all the losses it sustained. Plaintiff takes the position that, as a matter of law, National undertook a separate and distinct liability for each of the years from 1948 to 1965 inclusive. Plaintiff also contends that each year National became liable on a separate and distinct statutory bond. Predicated upon the same theory, plaintiff further urges that the summary judgment

limiting the liability of National to $10,000 was erroneous as a matter of law. Plaintiff's basic theory is that the applicable provisions of the Illinois Credit Union Act are mandatory and must be construed together with the bonds in ascertaining the true basis of National's liability and that these statutory provisions require that National's liability be cumulated by total computation of its liability during each of the years in question.

Quite to the contrary, defendant contends that it is liable only upon two bonds; the position bond and the blanket bond, each of which constitutes a single continuing contract. National urges that premium schedules and renewal applications cannot be treated as bonds but are separate and distinct therefrom. National further contends that the two bonds in question have clear, unambiguous and enforceable conditions for noncumulation of liability and that these provisions of the two bonds do not violate or contravene the statutes of Illinois but actually comply with the Illinois Credit Union Act and are standard forms approved by the proper officials of the State of Illinois and thus presumptively valid.

Consideration of the first issue requires examination of the provisions of the contractual documents executed by these parties. As above shown, the position schedule bond executed on February 28, 1946 (No. 862703) provided that the coverage on any position for separate periods should not be cumulative as to any occupant thereof. Each of the schedules executed by the parties for later years provided that the coverage for separate periods should not be cumulative; the liability of National for all defaults of any employee should not exceed the largest amount of coverage in force during any period within which defaults occurred and also the coverage for one period would not be available for defaults occurring within any other period. As above shown, the coverage in force during individual years of this position bond was $6000 for 1948 to 1951 inclusive and $10,000 from 1951 to 1957 inclusive.

The blanket bond (No. 3065971) was then put into effect by agreement of the parties during 1958 and remained until June 1, 1965. The amount of this bond was fixed at $10,000 by agreement of the parties during every year except 1958, when it remained at $8000. This bond provided that National's total liability was limited to the amount stated in the opening paragraph of the original bond. It also provided, under the heading "Non-Accumulation of Liability", that, regardless of the number of years that the bond continued in effect, the loss or losses should not be cumulative in amounts from year to year or period to period.

Plaintiff's first contention is that National is liable, separately, as to each of the years from 1948 to 1965 so that plaintiff is entitled to recover

the total amount of losses it sustained. This is predicated upon the theory that there was a new and separate bond executed in and for each year. The contrary position is taken by National that there were only two bonds executed by the parties; each of which constituted a single continuing contract. Merely upon reading the provisions of the two bonds, it would seem that National's theory comports with the provisions thereof. However, we will examine the leading cases pertaining to this type of situation which have been cited and discussed by both parties.

In *U.S. Fidelity Co. v. First Nat. Bank*, 233 Ill. 475, 84 N.E. 670, the Supreme Court dealt with a position bond. It provided that the aggregate liability of the surety should not exceed the amount written on the original bond opposite the name of each employee. Losses occurred during several years. The surety contended that its total liability was the amount specified in the bond and there was but one bond which was renewed from time to time. The court sustained this contention.

We find of greater value the later opinion in *Quinlan & Tyson, Inc. v. National Casualty Co.*, 311 Ill.App. 369, 36 N.E.2d 470, written by Mr. Justice Burke of this court. There, the parties entered into a position schedule bond which remained in effect for a number of years. One employee was involved in a series of losses during four consecutive years. These losses aggregated far more than the amount of liability specified in the bond. The bond provided that liability of the surety should not exceed the amount specified in the bond schedule for each employee. The bond was renewed annually by means of an anniversary list of employees. The renewal document provided that the surety did not assume liability for defaults exceeding the amount determined by the original bond obligation. The employer urged that each anniversary list constituted a separate contract and each imposed an additional liability on the surety. It urged that the contract should be construed in favor of the employer and against the surety.

This court held that the bond and the anniversary lists were one single continuing contract and did not constitute separate agreements. The court pointed out that, at the time the bond was issued, and as each anniversary list was issued, the employer could obtain the amount of protection for which he was willing to pay the premium. Also, if the employer so desired, the surety would enter into an agreement whereby the coverage of plaintiff's employees could be made continuous and also cumulative. This court held that under the contractual provisions of the pertinent documents the surety was not obligated to pay the total aggregate amount of all sums lost by the defalcations but was liable only to pay the amount specified in the bond as the limit thereof.

In *Massachusetts Bonding & Ins. Co. v. Julius Seidel Lumber Co.*,

(8th cir. 1960), 279 F.2d 861, losses were suffered by the employer over a number of years. The parties had executed a position schedule bond. The same issue developed as in the case at bar regarding cumulation of the liability of the surety upon an annual basis. The bond provided that the liability of the surety should not be cumulative; its aggregate liability on account of any one employee should not exceed the largest amount set opposite the position of such employee and the suretyship for one period should not cover defaults occurring within any other period. From time to time certificates of renewal were executed which also provided that the aggregate liability of the surety should not exceed the sum written opposite the name of the employee upon the renewal schedule. Other renewal documents provided that the coverage for separate periods should not be cumulative and that coverage for one period should not be available for default occurring within any other period.

The U.S. Court of Appeals decided the issue in favor of the surety. The court held that there was no ambiguity and that the contract between the parties was to be construed as plainly written. The court thus reached its conclusion after consideration of what it regarded as the clear language of the contract documents before it. The court cited a number of authorities to the effect that, where a bond is for an indefinite term, annual payment of premiums does not convert it into a series of separate annual contracts and, therefore, there is an implied exclusion of cumulation of liabilities which occurred during a series of years even in the absence of a specific provision against cumulative liability. See 279 F.2d 861 at 868, 869.

In *Columbia Hospital v. United States Fidelity & G. Co.*, (D.C. cir. 1951), 188 F.2d 654, the court dealt with a position bond. There, also, as in the case at bar, the employer suffered from a series of embezzlements by one certain named employee. The aggregate of these embezzlements exceeded the amount stated in the bond. The bond was for an indefinite term beginning on the date thereof and ending at the time of cancellation, with provision for payment of an annual premium. There was a provision that payment of premiums would not render the bond cumulative from year to year. There, also, as in the case at bar, the surety contended that its total liability was limited to the original amount of the bond. The employer contended that each renewal constituted a new bond. The court pointed out that where the bond was written for an indefinite term, with specification only of the date of its commencement, the annual payment of premiums does not create a series of separate yearly contracts. The court noted that even in the absence of specific language forbidding cumulative liability, this was excluded by

implication because of the continuous term of the bond. The court then disposed of the issue with the following language, (188 F.2d 654 at 657):

> "Where, as here, in addition to the continuous term of the bond, there was language in the bond or its attachments which militated against a finding of cumulative liability, the courts have consistently held liability to be limited, in the aggregate, to the amount stated in the bond (i.e., non-cumulative). United States Fidelity & Guaranty Co. v. Barber, 6 Cir., 70 F.2d 220; Brulatour v. Aetna Casualty & Surety Co., supra; Hack v. American Surety Co. of New York, 7 Cir., 96 F.2d 939."

Plaintiff attempts to differentiate *Columbia Hospital* primarily by reference to the dissenting opinion. This opinion merely holds that the language of the bond created an ambiguity so that it should be construed against the surety. However, we note that the United States Supreme Court denied *certiorari* (342 U.S. 817, 96 L.Ed. 618, 72 S.Ct. 31.) We find no later decision of the United States Court of Appeals or .of the United States Supreme Court adopting the views set forth in the dissent. In addition, as above shown, the law of Illinois is in accord with the majority opinion. We have carefully examined each and all of the many remaining cases cited by plaintiff. We do not find any decision involving a surety bond containing a clear provision forbidding accumulation of liability, as in the case at bar, where the court permitted imposition of cumulative liability by reason of the payment of annual premiums for renewal.

It would be impossible for us to consider within the space limitations of this opinion all of the cases cited by plaintiff in connection with this aspect of the case at bar. However, we will consider three decisions, all cited and relied upon by plaintiff, as representative of its contentions. In our opinion, none of these cases are applicable here for the reasons stated.

In *United States v. American Surety Co.*, (2nd cir. 1949), 172 F.2d 135, the court considered a surety bond covering a postal clerk. The bond did not contain any express provision against non-accumulation of annual liabilities such as we find in the case at bar. The court expressly stated that cases involving bonds which contain provisions clearly negating cumulative liability were not in point. (See 172 F.2d 135 at 137.) This decision was the subject of an annotation in 7 A.L.R.2d 946. The annotator expressly states that in cases involving language specifically limiting liability, these provisions are generally upheld. (See 7 A.L.R.2d 946 at 948.) The annotation cites a number of cases supporting the

proposition that courts will not hesitate to enforce clear and unambiguous provisions in employees' surety bonds which expressly negate cumulation of annual liabilities. (See 7 A.L.R.2d 946 at 957 and following.) Another example of adherence to this principle by the courts is to be found in a later decision by the Court of Appeals for the 2nd Circuit. In *Scranton Volunteer Fire Co. v. United States F. & G. Co.*, (2nd cir. 1971), 450 F.2d 775, the court enforced such an express provision against noncumulation and stated that the courts of New York have reached a similar result. 450 F.2d 775 at 776-777.

Plaintiff next relies upon *Aetna Casualty & Surety Co. v. Commercial State Bank*, (E.D. Ill. 1926), 13 F.2d 474, reversed in (7th cir. 1926), 19 F.2d 969, for reasons not material here. The bond involved in that litigation did not contain specific provisions against cumulation of liability as in the case at bar. Consequently the district judge concluded that the parties did not intend to restrict the liability to the amount stated in the bond. The court of appeals expressly refrained from passing upon this question.

In *Standard Acc. Insurance Co. v. Collingdale State Bank*, (3rd cir. 1936), 85 F.2d 375, the court expressly stated that, "Neither the bond nor the schedules contain any statement that the liability was to be noncumulative." (85 F.2d 375 at 376.) This language contradicts the statement made by plaintiff that the bond, there, was "identical" to the language in the case at bar. The bond itself involved in that case is reproduced in full in the opinion. It has no prohibition against cumulation of liabilities but merely states "* * * nor shall the suretyship granted for one period cover defaults occurring within some other period." See 85 F.2d 375 at 377.

By way of contrast in the case at bar, the repeated language in both the position bond and the blanket bond and the accompanying documents is clear and unambiguous and impels forcefully to the conclusion that the liability of the surety shall not be cumulative from year to year or from period to period irrespective of the total amount of the employer's losses. This basic distinction is graphically illustrated in *Hood v. Simpson*, 206 N.C. 748, 175 S.E. 193 which is also quoted from and relied upon by plaintiff. In that case, a bank cashier embezzled funds during each year from 1920 to 1931 inclusive. The parties executed one bond and a number of renewal documents. In 1929 the parties executed a so-called "superseded suretyship rider." This document was a prime example of ambiguity. It provided that the superseding bond covered any loss which would have been recoverable under any superseded bond. It also provided that it should not be construed to render the surety

liable for a larger amount than would have been recoverable under such superseded bond and also that the liability of the company would not be cumulative.

The court enforced cumulative liability. The court pointed out, by reference to its earlier decision in *Jacksonville v. Bryan*, 196 N.C. 721, 147 S.E. 12, that this result was reached because of the existence of the ambiguity. In *Jacksonville*, there was no ambiguity. (See *Hood v. Simpson*, 206 N.C. 748, 175 S.E. 193 at 199.) In the case at bar, since the language of the agreement between the parties is similarly clear and unambiguous, we are not authorized to use canons of construction (as plaintiff suggests) but we are obliged to enforce the agreement in accordance with its unmistakable terms. *Illinois National Insurance Co. v. Trainer*, 1 Ill.App.3d 34, 37, 272 N.E.2d 58. See also *Lauer v. Blustein*, 1 Ill.App.3d 519, 521, 274 N.E.2d 868.

However, plaintiff carries the argument further and urges strongly that the applicable provisions of the Illinois Credit Union Act are binding and mandatory and must be construed together with the contractual documents before us and that this statute requires that the liability of National be cumulated.

■■ In this regard, we must first state two general principles which constitute essential points of departure. The contract documents involved in the case at bar were all approved as to amounts by plaintiff's own board of directors. They were also approved, without exception, as to amounts and as to form by the Auditor of Public Accounts or by the Director of Financial Institutions of Illinois. Each and all of these documents were duly filed with either one of these two state officials. Under circumstances of this type, there is a presumption of validity of the bonds as they were written and executed by the parties. In this situation, the absence of any action by the duly elected officials of Illinois during all of the years in which these bonds were in their possession requires us to infer that the bonds were in proper form in accordance with the applicable law of Illinois. (See *Bernardini v. Home & Automobile Insurance Co.*, 64 Ill.App.2d 465, 467-468, 212 N.E.2d 499.) This principle is buttressed by its corollary which requires courts to presume that duly designated governmental officials have performed their duty in accordance with law. (*Weinstein v. Daley*, 85 Ill.App.2d 470, 476, 229 N.E.2d 357.) The next principle, also to be considered, is that the law of Illinois, which existed at the time of execution of these documents of surety, is deemed a part thereof with the same force and effect as though expressly referred to or incorporated therein. This has reference to the law as expressed in the constitution, statutes, and applicable court

decisions. *Goble v. Central Sec. Mutual Insurance Co.*, 125 Ill.App.2d 298, 302, 260 N.E.2d 860.

Application of these principles and disposition of this contention made by plaintiff requires examination of the pertinent statutes of Illinois. The Credit Union Act of Illinois was in existence when the original bond was executed by these parties in 1948. (Ill. Rev. Stat. 1947, ch. 32, par. 474 *et seq.*) This statute required the directors of the credit union to fix the amount of the surety bond which was to be required of all officers and employers handling money. The bond was to be approved as to amount by the Auditor of Public Accounts. This Act was amended by legislation effective October 31, 1953. (Ill. Rev. Stat. 1953, ch. 32, par. 496.1, *et seq.*) The provision for fixing of the amount of bond by the directors was retained. The amended statute also stated three pertinent requirements with reference to these surety bonds (par. 17): the bond was stated to be "* * * a condition precedent to qualification or entry upon the discharge of his duties * * *" as to every appointed or elected person handling funds or property of the credit union; the bond was to be given "* * * in such adequate sum as the Board of Directors and the Auditor of Public Accounts shall require and approve * * *"; schedule or blanket bonds were expressly permitted and such bonds were to "* * * be in the form prescribed by the Auditor of Public Accounts." These provisions, now relied upon by plaintiff, were retained in each and all of the credit union statutes applicable to and including 1965. The only change in the above cited language was the substitution of the Director of Financial Institutions for the Auditor of Public Accounts as stated in the 1965 enactment.

Upon examining this statute, it is most notable that there is no prohibition expressly set forth therein against contract provisions for noncumulation of the annual liability of the surety such as exist in the case at bar. There is no provision in this statute which expressly requires that new and distinct bonds be given during each year of the incumbency of any officer of the credit union. Neither does such prohibition appear by necessary implication from the language of the statute. This situation is accentuated by examination of *Hood v. Simpson*, 206 N.C. 748, 175 S.E. 193, quoted from and relied upon by plaintiff as above mentioned. There, the applicable statute of North Carolina contained language that any bank injured by breach of the statutory bond "* * * may put the same in suit and recover such damages as it may have sustained * * *." (175 S.E. 193 at 197.) This same language was repeated in *several* subsequent amendments to the statute. In view of the patent ambiguity existing in the contract in *Hood*, it appears that the statute

would enable the bank to recover all of its damages. No comparable situation exists in the case at bar.

■■ The courts of Illinois have given us precedent involving mandatory provisions of statutes which are required to be read into policies of insurance issued thereunder. In *Morelock v. Miller's Mutual Insurance Assn.*, 125 Ill.App.2d 283, 288, 260 N.E.2d 477, the court held that statutory language requiring insertion in an automobile liability policy of a provision covering damage or injury caused by the operator of an uninsured motor vehicle was necessarily deemed included within a policy and superseded a clause in the policy which would have attempted to limit this provision.

In the later case of *Smiley v. Estate of Toney*, 44 Ill.2d 127, 254 N.E.2d 440, in considering the same statute, the Supreme Court pointed out that mandatory provisions in the statute as to amount of recovery are binding upon the parties and may not be disregarded. Beyond the area of mandatory coverage, the parties were governed by the provisions of their own contract. This principle is applicable in the case at bar. There is no mandatory provision in the Credit Union Act of Illinois which requires cumulation of liabilities from year to year in the case at bar. The rights of these parties must necessarily be governed by the language of their own agreement.

In this regard, counsel for plaintiff presses the argument that the three above. cited provisions of the statute should be construed to require accumulation of liability. We cannot agree. The requirement that the bond was a condition precedent to qualification of the officer was fully complied with in the case at bar. It has no further efficacy. The form of each of the bonds and of the renewal documents, without exception, were prescribed by the Auditor or by the Director and approved by them. We cannot possibly construe the words "adequate sum" as reaching the result urged by plaintiff. In this context, the word "adequate" cannot possibly be taken to be equivalent to "unlimited." This language must be applied in a reasonable manner and necessarily must have reference to the situation as it existed in the minds and intentions of the interested parties when the bonds were written. This is shown by considering the entire language of this portion of the statute which provides that the bonds shall be in such adequate sum as the designated state official and plaintiff's own directors should require and approve. This record is clear and uncontradicted that the amounts in each case were fixed by these authorities upon due consideration of plaintiff's assets at the time in question. We cannot construe this statute as requiring cumulation of the annual liabilities.

It follows that the trial court acted properly and in accordance with law in limiting the recovery of plaintiff against National to the amount of $12,629.11, in entering judgment in favor of plaintiff and against National for said amount and also in denying plaintiff's motion for summary judgment against National in a larger amount.

Judgment affirmed.

BURKE, P. J., and HAYES, J., concur.