PEOPLE *v.* KOLOWICH.

1. Criminal Law—Motion to Quash Information—Evidence—Sufficiency.

Motion to quash information charging defendant with embezzlement, felonious abstraction, and misapplication of bank funds, on ground that evidence taken on examination was insufficient to sustain charge, *held,* properly denied.

2. Same—Embezzlement—Great Weight of Evidence.

In prosecution for embezzlement, felonious abstraction, and misapplication of bank funds, verdict of guilty *held*, not against great weight of evidence (3 Comp. Laws 1929, § 11963).

3. Same — Defrauding Bank — Overdrafts—Intent—Statutes—Misdemeanor—Felony.

One who with connivance of bank officer whom he has under his control secures possession of bank's funds by means of overdraft and converts them to his own use with intent to defraud bank, continuing such conduct over protracted period so as to secure possession of large amount of bank's funds, becomes guilty of offense other than misdemeanor defined as "overdraft" in banking law (3 Comp. Laws 1929, § 11932).

4. Same—When Overdraft More Serious Offense Than Misdemeanor.

Overdraft of itself may or may not be misdemeanor, and, under certain circumstances, said misdemeanor may become much more serious offense, as when committed with purpose of defrauding bank (3 Comp. Laws 1929, §§ 11932, 11963).

5. Same—Evidence—Testimony as to Other Acts—Intent.

Where defendant charged with defrauding bank by means of overdrafts claimed absence of criminal intent as defense, it was proper to show his other transactions at that time, such as his buying of stocks and bonds, for purpose of showing his financial condition, reasons for making such withdrawals, and other facts bearing on his motive and intent.

6. Indictment and Information—Joining Counts—Embezzlement—Defrauding Bank.

There was no error in joining embezzlement, abstraction, and misapplication of bank's funds, in same information, under three separate counts, where information follows language of statute apparently designed so that one count might be found to meet evidence presented (3 Comp. Laws 1929, § 11963).

7. Criminal Law — Information — Joining Counts — Harmless Error.

Error, if any, in joining said three counts in one information, *held*, not prejudicial, where defendant was found guilty under all three and identical sentences imposed to run concurrently.

8. SAME—ELECTION OF COUNTS.

Election between counts may not be required on ground that distinct offenses are charged, where they are committed by same acts, at same time, and same testimony must be relied on for conviction.

9. SAME—INSTRUCTION—EMBEZZLEMENT—ABSTRACTION.

In said prosecution, evidence *held*, to require instruction to jury that defendant could not be held guilty of both embezzlement and abstraction, and that instruction to that effect should have been given.

10. SAME—EVIDENCE—WITNESSES—ASSUMPTION OF CONTROVERTED POINT.

Question which assumes existence of points in controversy not yet proved is absolutely improper.

11. SAME—EVIDENCE—IRRELEVANT TRANSACTIONS.

In said prosecution, testimony as to loans made by bank to defendant's friends and corporations in which he was interested, in regular course of business, should not be admitted unless it is shown that they were made in order to aid defendant directly or that said transactions otherwise throw light on his financial condition; but such loans irregularly made could be shown as tending to show defendant's control of bank's affairs.

12. SAME—ARGUMENT OF PROSECUTOR—MISCARRIAGE OF JUSTICE.

Reference by assistant prosecuting attorney, in his closing argument, to failure of another bank and conviction of its president, to which case wide publicity had been given, *held*, so prejudicial that court cannot say that it did not result in miscarriage of justice, although said remarks were in nature of reply to argument of defendant's attorney, and trial judge expressly instructed jury to disregard them (3 Comp. Laws 1929, §§ 15518, 17354).

CLARK, SHARPE, and NORTH, JJ., dissenting.

Appeal from Wayne; Ferguson (S. Homer), J. Submitted October 13, 1932. (Docket No. 196, Calendar No. 36,356.) Decided March 2, 1933.

George J. Kolowich was convicted of embezzlement, felonious abstraction, and misapplication of bank funds. Reversed, and new trial granted.

*Payne & Payne* (*Albert McClatchey,* of counsel), for appellant.

*Paul W. Voorhies,* Attorney General, *Harry S. Toy,* Prosecuting Attorney, *Duncan C. McCrea* and *Edmund E. Shepherd,* Assistants Prosecuting Attorney, for the people.

BUTZEL, J. George J. Kolowich, of Hamtramck, Michigan, was convicted of embezzlement and the felonious abstraction and misapplication of bank funds, as defined in section 66 of the general banking act (Act No. 66, Pub. Acts 1929; 3 Comp. Laws 1929, § 11963). The first count of the information charges that on the 15th day of May, 1930, defendant, as president, director, agent, servant, and employee of the State Bank of America of Hamtramck, Michigan, came into possession of $82,933.58 of the bank's moneys, and that he fraudulently and feloniously embezzled it, etc. The second count, substantially like the first count, charges that he abstracted the money. The third count charges him with misapplication of the funds. All of the counts charge that he disposed of and converted to his own use the personal property of the value stated, and that, without authority of the board of directors of the bank, he drew orders, bills of exchange, and drafts with intent to injure and defraud the bank, and that he made false entries in books, reports, and statements of the bank with intent to deceive his fellow officers of the bank and the State bank examiner.

It is claimed that defendant's motion to quash the information should have been granted because the evidence taken on the examination was insufficient to sustain the charge. The testimony on the hearing appears in the record and was sufficient to justify holding the defendant for trial. Defendant claims

further that he was entitled to a directed verdict, and that the verdict was against the great weight of the evidence. For this reason, it is necessary to detail some of the facts.

Defendant occupied a prominent position both in public life and in financial circles. He had been very successful in the years previous to 1929, and had amassed a considerable fortune, represented by real estate, land contracts, stocks, etc. He had been actively engaged in the banking and real estate business, and at one time he, with several others, owned a private bank in Hamtramck, known as the Merchants & Mechanics Bank, and herein referred to as the "private bank." His wife purchased the interests of those previously associated with him, so that he became virtually the sole owner and proprietor of the private bank, owing to the inability of a married woman to become a copartner of her husband. Just previous to its failure, the bank did a flourishing business and had many depositors, consisting principally of working men and trades people.

The State Bank of America of Hamtramck, Michigan, was incorporated under the State banking laws with a capital of $100,000. Defendant owned 650 shares and his brother Adolph 100, so that together they held 75 per cent. of the stock. The board of directors consisted of defendant, his brother, and four others, three of whom owned only 10 shares apiece, and one held 25. The bank was supposedly run under the direction of the board, officers, and loan committee, with usual powers. One Willard Babcock was a director and the cashier. He had been advanced to this position after a short period in a less important capacity. Defendant, who was responsible for his employment, turned over to him without consideration 10 shares of stock so as to

enable him to qualify as a director. Babcock testified that he never took instructions from any member of the board other than defendant while acting as cashier and director. They had frequent conferences, and, during the fiscal month in which defendant is alleged to have committed the crimes charged, Babcock saw defendant daily at his private bank, discussing with him the affairs of the State Bank of America.

The business of the private bank was conducted by defendant with the assistance of John W. Kempisty, acting as cashier and manager. There were also a number of tellers, bookkeepers, messengers, etc. The private bank deposited its funds with the State Bank of America, and also had a checking account with two Detroit banks. During the 30 days during which the alleged embezzlements, etc., took place, the private bank deposited over $500,000 with the State Bank of America, but its withdrawals far exceeded this amount. Defendant authorized Kempisty to sign drafts of the private bank on the State Bank of America. The drafts were printed with the words "President-Cashier" appearing below the line reserved for the signature. When Kempisty signed the drafts, the word "president" was stricken out. Due to his frequent absences from the private bank, Kempisty made a practice of signing blocks of 25 or more drafts in blank, leaving the spaces for the date, name of the payee, and amount, to be filled in by the tellers as funds were needed. When the demands of depositors were particularly heavy, and additional cash needed, the blank spaces in the drafts would be filled in by a teller and the drafts sent over to the State Bank of America, where they would be honored, and the cash brought back to the private bank.

During the 30 days following May 15, 1930, 11 drafts, signed by Kempisty and aggregating $82,933.58, were paid by the State Bank of America, though there were no funds to the credit of the private bank with which to pay them at the times they were presented. All of them, with the exception of one made payable to M. J. Meehan & Company, brokers, in the amount of $9,980, represented cash withdrawals by the private bank. During this 30-day period, there was a run on the private bank by its depositors, so that there was an immediate need of funds to prevent the closing of the bank's doors. Defendant claims that he had no idea of the extent of the overdrafts, that there was no intention on his part to overdraw his account, and that he always had good reason to believe that he would have no difficulty in making good any overdrafts; that he was not guilty of any crime, even though he may have committed a misdemeanor as defined in 3 Comp. Laws 1929, § 11932. This section provides that any officer or employee of a bank who knowingly, wilfully, and persistently overdraws his account shall be guilty of a misdemeanor.

There is competent testimony showing that when these overdrafts reached the State Bank of America, where they were paid under orders given by Babcock, they were carried as cash items in order to avoid the appearance of the overdrafts on the books. Babcock claims he was acting under the express instructions of the defendant. The State Bank of America's records were falsified so as to make it appear that the overdrafts were cash on hand, consisting of a large number of bills of particular denominations, never actually in the possession of the bank. Defendant had previously issued overdrafts but had always taken care of them. He claims he

did not know of the extent of the overdrafts until they had all been honored by the drawee bank. He alleges that he did not know of the practice of overdrawing. On June 16, 1930, when defendant's attention was called to the large amount of the overdrafts, he immediately attempted to secure a loan from a number of Detroit banks, where he had reason to believe that he had a large line of credit. The Detroit banks refused to come to his assistance, owing to the fact that his assets were not sufficiently liquid in nature. Without delay, he reported the condition of the bank and his overdrafts to the State banking commissioner. Defendant immediately turned over to the State Bank of America, with the consent of its board of directors, valuable real estate that apparently would have been more than ample security to protect the bank against loss had it not been for bankruptcy proceedings in which Kolowich and his private bank were involved, with a resultant setting aside of the preference. The State Bank of America went into the hands of a receiver, and the prosecution of defendant followed.

There are many facts that tend to show a lack of criminal intent on the part of defendant in the entire transaction. However, Babcock's testimony that he was acting only under the instructions and directions of defendant; that he saw defendant daily during the time the money was being taken from the bank; that overdrafts were carried as cash items in accordance with instructions received by Babcock from defendant and transmitted by him to the teller; that he told defendant that overdrafts were being carried as cash items; that, according to additional testimony, defendant was at the private bank at least four hours each day while the moneys were being withdrawn from the State Bank of America; that,

at the very time in question, defendant was making heavy withdrawals by issuing drafts on the drawee bank for the payment of stock and bonds in which he was dealing, as well as many other facts, tend to overcome defendant's claims. There was sufficient testimony to justify the verdict of the jury. It was not against the great weight of the evidence.

Numerous other errors are assigned. Defendant contends that, even looking at his conduct in the most unfavorable light, he was only guilty of overdrawing. Defendant's acts are repeatedly referred to by the prosecution as "overdrafts." There is no question that this terminology is correct. However, securing the funds by overdraft is only the means that defendant is charged with having used in committing a much more serious offense. One may be guilty of a lesser offense in committing a much more serious one. If one, with the connivance of a bank officer whom he has under his control, secures possession of the bank's funds by means of an overdraft and converts them to his own use with intent to defraud the bank, continuing such conduct over a protracted period so as to secure possession of a large amount of the bank funds, he becomes guilty of more than the misdemeanor defined by the banking law, 3 Comp. Laws 1929, § 11932. An overdraft of itself may or may not be a misdemeanor. An act apparently innocent on its face, or under certain circumstances a misdemeanor may become a much more serious offense when committed with the purpose of defrauding the bank. See *People* v. *Comstock,* 115 Mich. 305; *Brock* v. *United States,* 79 C. C. A. 121 (149 Fed. 173); *Breese* v. *United States,* 45 C. C. A. 535 (106 Fed. 680); *State* v. *Kortgaard,* 62 Minn. 7 (64 N. W. 51); *State* v. *Larson,* 123 Wash. 21 (211 Pac. 885); *State* v. *Kubli,* 118 Ore. 5 (244 Pac. 512); *State* v. *Owen,* 119 Ore. 15 (244 Pac. 516).

Over defendant's objections, the prosecution was permitted to show by the books of the private bank that, during the time the overdrafts were being issued, large sums were being paid for stocks and bonds by the private bank through checks or drafts drawn on the State Bank of America. Kempisty testified that the private bank was buying "quite a bit" from a firm of stock brokers, and one of the tellers of the private bank stated that large amounts of money were paid during the 30-day period to stock brokers for the purchase of stocks and bonds. While the law does not prohibit the purchase of stocks and bonds, nevertheless, when the owner of a private bank is engaged in purchasing stock and at the same time illegally taking the funds of another bank under his control, his general conduct in the course of his business becomes a matter of vital importance in so far as the determination of intent is concerned. Under section 27 of chapter 28 of the criminal code (3 Comp. Laws 1929, § 17320), it is provided:

"In any criminal case where the defendant's motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing an act, is material, any like acts or *other* acts of the defendant which may tend to show his motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing the act, in question, may be proved, whether they are contemporaneous with or prior or subsequent thereto; notwithstanding that such proof may show or tend to show the commission of another or prior or subsequent crime by the defendant."

When defendant is charged with defrauding the bank and he claims an absence of criminal intent as a defense, it becomes important to show defendant's

other transactions at the time, for the purpose of showing his financial condition, the reasons for making his withdrawals, and other facts, all as bearing on his motive and intent. See *People* v. *Armstrong,* 256 Mich. 191; *Dimmick* v. *United States,* 70 C. C. A. 141 (135 Fed. 257); *State* v. *Kubli, supra; People* v. *Rowland,* 12 Cal. App. 6 (106 Pac. 428); *Quertermous* v. *State,* 95 Ark. 48 (127 S. W. 951); *Ambrose* v. *United States,* 45 App. D. C. 112; *Camp* v. *State,* 31 Ga. App. 737 (122 S. E. 249); *State* v. *Lindstrom,* 180 Minn. 435 (231 N. W. 12).

Defendant contends that these three acts, embezzlement, abstraction, and misapplication, are entirely different crimes, so inconsistent in nature that they may not be joined in the same information. We can see no merit in this claim. The fact that the legislature named them in the same section of the statute, even in the same sentence, is strong indication that their inclusion was designed to prevent escape from just punishment through technical evasions based upon possible slight variations in the elements of these crimes. There was no error in drawing these counts so that one of them might be found to meet the evidence as presented. In *Jewett* v. *United States,* 41 C. C. A. 88 (100 Fed. 832, 53 L. R. A. 568), the court said:

"Nevertheless, while 'embezzlement' and 'misapplication' are not convertible terms, 'misapplication' is the broader, and covers 'embezzlement.' The statute, in this particular, is one of those frequently found in criminal legislation, as well as in other legislation and in private instruments, where there is first used a word of narrow application, and afterwards a broader one, and so continued until there is a certainty that the entire purpose sought to be accomplished is accomplished. It is not necessary,

under such circumstances, to apply the rule that every word in a statute must have its effect, to such an extent as to hold that the generic term is to be so peculiarly construed, contrary to its settled meaning, as to exclude from its scope the narrower word, which, precedes it.''

It would seem that, even assuming there is some merit to defendant's contentions, he was not injured by the alleged error in joinder, inasmuch as a verdict of guilty was returned on all three counts and identical sentences imposed for each count, to run concurrently.

Defendant, however, claims that the prosecution should have made an election as to which count it relied upon. Where one is charged with several crimes very similar in character, each carrying the same punishment and calling for much the same testimony, it does not at all become necessary for the prosecution to make an election. *People* v. *McKinney,* 10 Mich. 54; *People* v. *Aikin,* 66 Mich. 460 (11 Am. St. Rep. 512) ; *People* v. *Dyer,* 79 Mich. 480; *People* v. *Warner,* 201 Mich. 547; *People* v. *Sachse,* 252 Mich. 275.

In *People* v. *Grabiec,* 210 Mich. 559, the court again approved of the rule which it quoted from *People* v. *Warner, supra,* as follows:

''Election between counts cannot be required on the ground that distinct offenses are charged, where they are committed by the same acts, at the same time, and the same testimony must be relied on for conviction.''

The precise question as to whether the statute intended separate punishments for embezzlement, felonious abstraction, and misapplication arising out of the same transaction, is not properly before us. Under the facts in the case, there may be some

question as to whether defendant could be guilty of embezzlement and fraudulent abstraction in the same transaction. The court should have instructed the jury that the defendant could not be guilty of both embezzlement and abstraction under the evidence.

The prosecutor asked Babcock on redirect examination as follows:

"*Q.* You took your orders from Mr. Kolowich, didn't you?

"*A.* Yes, sir.

"*Q.* Did you ever try refusing one of these drafts when Kolowich told you to cash it?"

An objection to this question was overruled, and witness answered:

"I never tried it."

The question was absolutely improper, because it assumed points in controversy not yet proved. As the case must be tried again, we call attention to the error. See *People* v. *Lange,* 90 Mich. 454; *Branch* v. *Klatt,* 173 Mich. 31; *Nelson* v. *Hunter,* 140 N. C. 598 (53 S. E. 439); *White* v. *City of Boston,* 186 Mass. 65 (71 N. E. 75).

Error is further charged in admitting the testimony of the bank examiner showing loans made to defendant's wife, his friends, and corporations in which he was interested. No irregularity is shown as to most of these loans. They were well secured at the time the money was loaned, and were made long before May and June, 1930. Some of them were repaid. The tendency of such testimony in the present case would be to impress the jury with the fact that defendant had looted the bank. Almost all of these loans and the aggregate amount of them have no bearing upon the intent or motive for

the commission of the crimes charged. However, such loans as were irregularly made would tend to show defendant's control of the bank's affairs. On a retrial, testimony as to loans made in the regular course of business should not be admitted unless it is shown that the loans were made in order to aid defendant directly or that the transactions otherwise throw light upon defendant's financial condition.

In the closing argument, defendant's attorney, in addressing the jury, argued that Kolowich was the victim of the general business conditions that resulted in so many bank failures. The argument was possibly provocative in character, but the prosecution went far beyond any reasonable bounds in its reply. The assistant prosecutor, in his closing argument, said:

"I haven't much more to say to you. I ask you to do what you think is right in this case, but I ask you to remember that there are more ways than one for justice to work. I ask you to remember that those poor people out there who put their money in this bank have a right, the same as he has, in this country, and counsel may say it is conditions. Of course, it is conditions, I suppose he would also tell you that the Bob Allan transaction had nothing to do with the American State Bank failure."

A short time preceding defendant's trial, one Robert Allan had been convicted of felony in connection with the failure of the American State Bank, a very large banking institution in the city of Detroit. The trial, lasting several weeks, and the conviction itself, held the public interest. Complete accounts occupied the front pages of the newspapers, and the blame for the failure was attributed to the conduct of Allan, its president. The familiarity of the public

with the case is shown by the very language used by the prosecutor in reference to the failure and Allan's connection with it. He must have assumed that the jury, in common with the general public, knew about the failure and Allan's conviction. One natural inference would be that Allan's guilt indicated that of the defendant. The remarks were made without the opportunity of the trial judge to prevent them and he instructed the jury in no uncertain manner to disregard them.

The loss wrought by a bank failure is visited on its many innocent depositors, whose indignation and resentment justly follow. When, as has been brought to our attention, there have been so many bank failures during recent years, the entire public conscience is aroused. If the failures are due to the dishonest acts of bank officers, the zeal of the prosecutor in vigorously prosecuting the offenders, in line with his duties, is to be highly commended. However, with public indignation at its height, it still remains his duty to see that the constitutional right to a fair trial is afforded the accused. This duty is neglected when, in a trial of this kind, the prosecutor in his final address to the jury, calls its attention to a different bank failure, to the very recent trial of its president, and his conviction, attended by very great publicity, despite the fact that it is not in the remotest degree related to the case being tried. It was highly prejudicial in the instant case when the intent of defendant, a very close question, became the pivotal point in the case. It is true that the trial judge expressly instructed the jury to disregard the remarks, but the damage was done. An ink spot may be blotted out in part, but the stain still remains. We have at times refused to reverse cases on account of improper statements of counsel made

in the heat of argument, when the entire record shows that the result has not been affected thereby and that there has been no miscarriage of justice. 3 Comp. Laws 1929, § 15518. In the present case, however, the intent of defendant was the all important question for the jury to determine, and the verdict, based largely on the decision of an exceedingly close question, may well have been affected by the reference to the failure of another bank and the conviction of its president. The remarks were so highly prejudicial that we cannot say defendant had a fair trial.

In Michigan, it has been held that refusal by the trial court to sustain an objection to references to another unrelated crime constitutes reversible error, if such references tend to exert a prejudicial effect upon the jury. *People* v. *Nixon,* 243 Mich. 630. Cautionary instructions by the court may be insufficient to cure the damage done. *Burrows* v. *State,* 38 Ariz. 99 (297 Pac. 1029) ; *People* v. *McLaughlin,* 337 Ill. 259 (169 N. E. 206) ; *People* v. *Chrfrikas,* 295 Ill. 222 (129 N. E. 73). It is law in Michigan and most other jurisdictions that inflammatory remarks irrevelant to the issue may be so prejudicial that they cannot be cured by the instructions of the court to disregard them. *Solomon* v. *Stewart,* 184 Mich. 506 (Ann. Cas. 1917 A, 942) ; *Cluett* v. *Rosenthal,* 100 Mich. 193 (43 Am. St. Rep. 446) ; *Hillman* v. *Railway,* 137 Mich. 184; *Wells* v. *Moses,* 87 Minn. 432 (92 N. W. 334) ; *Dannals* v. *Sylvania Township,* 255 Pa. 156 (99 Atl. 475) ; *Bloodgood* v. *Whitney,* 200 App. Div. 56 (192 N. Y. Supp. 383) ; *Seaboard Air Line R.* v. *Smith,* 53 Fla. 375 (43 South. 235) ; *Ernst Zobel Co.* v. *Canals,* 188 App. Div. 231 (176 N. Y. Supp. 537) ; *Mittleman* v. *Bartikowsky,* 283 Pa. 485 (129 Atl. 566) ; *Robinson* v. *United States* (C. C.

A.), 32 Fed. (2d) 505 (66 A. L. R. 468). See, also,
78 A. L. R. 1438 for a complete annotation of this
subject.

The conviction is set aside, and a new trial or-
dered.

McDONALD, C. J., and POTTER, FEAD, and WIEST,
JJ., concurred with BUTZEL, J.

SHARPE, J. (*dissenting*). The remarks of one of
the attorneys for the defendant, referred to by Mr.
Justice BUTZEL, might well be set forth at greater
length. He stressed the fact that the failure of the
smaller banks, of which defendant's was said to be
one, was brought about by the action of the larger
banks. He stated that his own fortune of a million
dollars had been wiped out and that of the assistant
prosecuting attorney as well, and that carpenters,
butchers, and others had "all been cleaned." In
closing, he said:

"I hope when you come out of the jury room that
you will face the situation as I want you to face it;
open the doors wide, and let the whole world know
that this system which has been built up so as to
make slaves out of you and I, and so as to destroy
what you have accumulated, is the cause of George
Kolowich's failure."

The remarks of the assistant prosecutor, quoted
in Mr. Justice BUTZEL's opinion, may well be said to
have been in answer thereto.

This court has the right to assume that the jurors
impaneled to try this case were men and women of
intelligence. We also have the right to assume that
each one of them knew about the Allan trial, that
they had read about it in the daily papers, and had
talked about it in their families and among their

friends, and knew that he had been convicted. The remark was unfortunate, and should not have been made. On objection by defendant's counsel, the trial court said to the jury:

"The court will instruct you, members of the jury, that that last remark you will entirely eradicate from your mind. We are trying but one person in this trial. You are not concerned with the trial of any other individual. You will eliminate that from your minds. You are not to be biased by it, or not be prejudiced by it, nor will it make you sympathetic. You are just to disregard it entirely."

I concur with Mr. Justice BUTZEL in holding that the trial was otherwise free from reversible error. But, in my opinion, it cannot be said that it affirmatively appears that "the error complained of has resulted in a miscarriage of justice." 3 Comp. Laws 1929, § 17354.

The judgment should be affirmed.

CLARK and NORTH, JJ., concurred with SHARPE, J.