## UNITED STATES FIDELITY & GUARANTY CO. v. BARBER.

### No. 6478.

Circuit Court of Appeals, Sixth Circuit.

April 13, 1934.

Albert McClatchey and T. W. Payne, both of Detroit, Mich. (Payne & Payne and Albert McClatchey, all of Detroit, Mich., on the brief), for appellant.

O. L. Smith, of Detroit, Mich. (Neill E. Graham and James R. Neill, both of Detroit, Mich., on the brief), for appellee.

Before HICKS and SIMONS, Circuit Judges, and WEST, District Judge.

SIMONS, Circuit Judge.

The appeal raises questions affecting the liability of an insurer and its extent, upon a so-called fidelity schedule bond, issued to a bank to indemnify it for losses sustained

through dishonest or criminal acts of employees listed in schedules forming part of the bond. The appellant is the insurer, and the appellee receiver for the insured, who as plaintiff below obtained the judgment here reviewed.

The bond was originally written in 1927. It provided that, for consideration of a premium based upon an annual rate of 30 cents per $100 of insurance, the insurer bound itself to pay such pecuniary loss as the insured would sustain through the "fraud, dishonesty, forgery, theft, embezzlement, wrongful abstraction, misapplication or misappropriation, or any other dishonest or criminal act or omission, of or by any of the employees listed in the schedule forming part of this bond, directly or in connivance with others * * * during the period commencing upon the date each employee is listed hereunder, and continuing in amounts scheduled until the termination of this insurance." The employer was to have the right without impairing the continuity of the bond, to add to the schedule the names of other employees, to increase or decrease the amount of insurance of any employee, and was required to notify the insurer of loss within ten days after its discovery. The insurance was to be terminated only by written notice of either party, or as to any employee by his retirement from the employ of the insured, or upon the discovery of a loss through him.

The first schedule attached to the bond covered the period October 1, 1927, to October 1, 1928. With this schedule, the employees covered thereby, and the amount of protection as to each, we have no concern. The second schedule covered a period beginning October 1, 1928, insured the fidelity of George J. Kolowich as president in the sum of $10,000, Frank J. Zielinski as pay teller for $40,000, and A. Goscicki as bookkeeper for $10,000. By change and acceptance notice Willard Babcock was added, with liability of $25,000, from June 11, 1929, as manager, loan department. The third schedule covered the period beginning the 1st day of October, 1929, and insured the fidelity of Kolowich, Babcock, and Goscicki in the same amounts as under the preceding schedule, but listed Babcock as cashier, and reduced the coverage for Zielinski to $25,000. This schedule contains the following proviso: "Provided this list shall be deemed a part of the original bond, and not a new obligation, nor shall it create cumulative liability."

In subsequent change and acceptance no-

tices during the period covered by the third schedule, the name of A. Goscicki was withdrawn, and the name M. A. Gosicki was substituted, with the title of teller and bookkeeper, and the name Frank J. Zielinski as pay teller was withdrawn and Frank J. Zielinski as assistant cashier was substituted. The losses claimed to have been sustained by the insured were suffered in the periods covered by the second and third schedules, as amended, and such periods will be hereinafter respectively referred to as first and second periods.

The losses for which liability upon the bond is asserted are claimed to have resulted from the several dishonest or criminal acts of Kolowich, president, Babcock, cashier, Gosicki, paying teller, and Zielinski, bookkeeper and assistant cashier. An understanding of the issues involved necessitates a somewhat detailed, though necessarily condensed, statement of the relationship of the employees named to the bank, and their activities in respect to the transactions involved.

George J. Kolowich was the president and principal stockholder in the State Bank of America, which was a Michigan corporation located in Hamtramck, Mich. With his wife, Irene G. Kolowich, he also operated a private bank in Hamtramck, known as the Merchants' & Mechanics' Bank, which carried a commercial account with the State Bank of America, and of which one John W. Kempisty was the cashier and manager. In addition to his banking activities, Kolowich was also a stockholder and director in a corporation known as Kolowich and Johns, likewise a depositor and customer of the State Bank of America. As president and director of the latter bank, Babcock, Gosicki, and Zielinski were subject to his orders; Babcock having qualified as a director by virtue of shares given to him by Kolowich. Kempisty was Kolowich's employee in the Merchants' & Mechanics' Bank.

During the period from March 31, 1930, to June 18, 1930, there was what was designated as a run on the Merchants' & Mechanics' Bank, which resulted in withdrawal therefrom by its depositors of between three and four hundred thousand dollars. To meet these withdrawals, the Merchants' & Mechanics' Bank drew upon its deposit in the State Bank of America. Shortly before, but during a period of somewhat active withdrawal, Kolowich had instructed Babcock, the cashier of the State Bank of America, not to let the daily balance of the Merchants' &

Mechanics' Bank fall below four or five thousand dollars, and to pay all drafts by the latter without regard to whether there were sufficient funds on deposit to cover them. Instruction to that effect was given by Babcock to Gosicki, the teller. During the period mentioned, a series of eleven drafts for a total of over $94,000, and resulting in an overdraft of $80,626.37, were presented to the State Bank of America, and were paid by Gosicki under the instructions relayed to him from Kolowich through Babcock. There being insufficient funds to honor the drafts, Gosicki placed them in his cash drawer and entered them on his daily blotter and cash book as currency. Zielinski transferred these entries into the general ledger of the bank. Upon being informed of the cashing of the eleven drafts, Kolowich set about to get a loan to cover the shortage, but, being unable to do so, notified the banking commissioner. The latter suggested security, and, of various properties submitted by Kolowich, two parcels were selected by the commissioner and the board of directors of the bank, whereupon Kolowich and his wife executed a quitclaim deed thereof to the bank to secure a promissory note for the amount of the overdraft, payable on or before one year from its date. Shortly thereafter Kolowich was adjudicated a bankrupt, and turned over all of his property to his trustee. The State Bank of America went into receivership, and its receiver filed a claim in the bankruptcy proceedings against Kolowich for $435,000. What this consisted of does not appear. The referee made an order disallowing the claim unless the receiver would within five days surrender the preference given to secure the overdraft. The receiver, deeming it more advantageous to pursue the larger claim than to retain the security, surrendered it.

In addition to the loss occasioned by the overdraft transaction was a loss sustained on a note of Irene G. Kolowich in the amount of $14,373.50, the proceeds of which went to the Merchants' & Mechanics' Bank. While the note was given by Mrs. Kolowich, it is claimed it was for the benefit of George J. Kolowich, who at the time already owed the State Bank of America an amount in excess of his borrowing limit under the statutes of Michigan. The note was originally for a much larger amount, secured by stock owned partially by George J. Kolowich in the Detroit Housing Corporation, and was reduced presumably by sale of the collateral. Another item of loss claimed to have been sustained through the acts of Kolowich and Babcock was upon a note for $20,000 executed by Kolowich in the name of Kolowich and Johns. Kolowich had no authority to make the note; it was given to the bank without the knowledge of his associates in the corporation, and Babcock was instructed by Kolowich not to let Johns know anything about it. The draft given by the bank for the note was cashed at the Merchants' & Mechanics' Bank upon indorsement of Kolowich. Still another loss was upon a note for $12,580 executed by John W. Kempisty, and later reduced by a $2,000 payment. The proceeds of this note it is claimed went into the Merchants' & Mechanics' Bank, and it is the contention of the receiver that on the Kolowich and Johns, and the Kempisty notes, just as on Mrs. Kolowich's note, the real borrower was Kolowich, and, his borrowings in each case being in excess of the amount permitted by law, the losses resulting therefrom are within the protection of the bond.

Over the objections of counsel, with exceptions duly noted, evidence was received upon all the claimed losses. They totalled over $125,000. Of this amount $10,580 resulted from the discounting of the Kempisty note in the period October 1, 1928 to 1929, covered by the second schedule, and the balance during the period October 1, 1929 to 1930, covered by the third schedule. The court, construing the bond as a cumulative or multiple security bond, instructed the jury that the maximum permissible recovery was $80,580. This was on the theory that the four employees were covered during the second period for a total of $70,000, made up of a coverage of $10,000 for Kolowich, $25,000 for Babcock, $10,000 for Gosicki, and $25,000 for Zielinski, and that there was additional coverage during the first period by reason of the cumulative or multiple character of the bond of $10,000 for Kolowich and $25,000 for Babcock; this being more than sufficient to cover the loss of $10,580 on the Kempisty note during that period. The jury returned a verdict for the maximum amount of liability as thus indicated, with interest.

We come first upon a question of notice. As we have already observed, the bond provides that the insured upon the discovery of any loss shall within ten days thereafter deliver notice thereof to the insurer. The overdraft was discovered on June 16, 1930. It is claimed that this constituted discovery of the loss, and that the insurer should have been notified of it within ten days thereafter. But Kolowich's financial condition was then not known by the bank's board of di-

rectors to be critical. He was assumed to be a man of large means. He tendered to the banking commissioner and to his board many parcels of real estate thought to have sufficient value to secure the payment of the overdraft. Of these but two were selected. The bank was closed upon June 18th, and it was not until several days thereafter that Kolowich was adjudicated a bankrupt. Following the closing of the bank, its board of directors was without any authority to act for it, and it was not until the appointment of the appellee as receiver that any one was vested with authority to ascertain the condition of the bank. The receiver testified that he did not learn that the overdraft was going to produce a loss until July 22d, seven days after his appointment. There is no testimony contra. The receiver immediately thereafter notified the insurer. The complicity and connivance of the other employees in connection with the overdraft was not discovered until later. On July 31st, well within the ten days following the discovery of the overdraft, the receiver wired the insurer notifying it of claimed irregularities by Gosicki, Babcock, and Zielinski with reference thereto. In respect to the losses upon the notes herein described, there is nothing in the record to indicate that the board of directors had any knowledge that loss would result therefrom, or that the receiver did not communicate the fact of these losses to the insured within the required time. We do not understand that anything short of knowledge that a loss has been or will be sustained fixes the critical date from which the time for giving notice begins to run. The issue as to notice was properly presented to the jury. We find no error in the instructions with respect thereto.

It is next contended that the security demanded of and accepted from Kolowich to secure the amount of the overdraft was a settlement with Kolowich, canceled the obligation, and released the insurer. We find nothing in the record to sustain the view urged upon us. Kolowich's note and the quitclaim deed executed by him and his wife were quite clearly taken by the bank as security and not as payment, and the jury upon apt instruction so found. Moreover, the appellant was not prejudiced thereby. It might with good reason have complained if the security, which when offered was thought to be ample, had been refused by the bank. Nor was the surrender of the security upon the order of the referee in bankruptcy prejudicial to the surety. The deed might have been set aside as a voidable preference, and in any event the surrender of the security was made by the receiver in order to prove a much larger claim, which presumably included other items of indebtedness by Kolowich for which liability is here asserted. We find no error in the denial of the motion for directed verdict upon this ground, nor in the instructions of the court with regard to it.

With respect to the liability of the insurer as to Kolowich during the second period for losses occasioned through the overdraft, little need be said. Upon evidence substantially identical with that here submitted, Kolowich was convicted in the Wayne county circuit court of embezzlement and misapplication of bank funds, as defined in 3 C. L. Mich., § 11963. While the case was reversed (People v. Kolowich, 262 Mich. 137, 247 N. W. 133) on another ground, the proofs were there held sufficient to justify the verdict of the jury. Moreover, substantial evidence was here adduced of violations by Kolowich of sections 11922, 11932, and 11947, C. L. Mich. (the Banking Act). Section 11932 penalizes one who knowingly, willfully, and persistently overdraws his account, and section 11922 provides that the total liability to any bank of any person or corporation shall not exceed one-tenth of the amount of its capital and surplus, and that, before any bank shall loan any of its funds to its officers or employees, such loans shall be first submitted to the directors of such bank for their approval. It is clear that the overdrafts resulting from the cashing of the Merchants' & Mechanics' drafts were not approved by the directors of the bank, and that the liability resulting therefrom was far in excess of the statutory limit. Section 11947 provides that every officer or employee of a bank who shall knowingly aid or assist in a violation of any of the provisions of the act shall be deemed guilty of a felony. There was clearly substantial evidence of violations of this section by Kolowich.

Nor need there be detailed discussion of the liability of the insurer during the second period for the acts of Babcock and Gosicki. Gosicki cashed the drafts and held them in the cash drawer as cash items with the knowledge that there was no deposit balance sufficient to cover them. Babcock was the cashier, knew all of the circumstances, and directed Gosicki in all of his activities in relation to the overdraft. There was no error in permitting the jury to find that Babcock and Gosicki unlawfully aided Kolowich

in unlawful abstraction of funds from the bank. The proofs bring their activities within the language of both the statute and the bond.

■■ A somewhat closer question, perhaps, is presented by the record in respect to the activities of Zielinski. There is no question that in transferring to the ledger the entries made by Gosicki upon the teller's blotter and daybook he made false entries upon the books of the bank. This alone would perhaps not have been sufficient to impose upon the defendant any liability for the acts of Zielinski. Something more was needed—knowledge that the entries were false, or an intent to aid Kolowich and the others in fraudulently and unlawfully creating the overdraft. Circumstances from which such knowledge and intent may reasonably be inferred are, we think, sufficiently disclosed by the record to raise a question of fact for the jury. Zielinski knew of the practice to honor the drafts of the Merchants' & Mechanics' Bank without respect to the balance in its deposit account, and to carry such drafts as cash items in the cash drawer. While it is not clear that he himself cashed any of the drafts here involved, it is, we think, fairly in the record that he knew that they were cashed, and had seen them in the cash drawer. Zielinski was a hostile and an evasive witness, and admissions were drawn from him with difficulty. The final question to him in redirect examination was: "And you were good enough banker to know that those entries were false, weren't you?" Even though categorical response was evaded, his answer, "I worked in the bank long enough," we think was alone sufficient to sustain the verdict of the jury in respect to liability for his acts in connivance with the other employees, safeguarded as the plaintiff's rights were by the careful limitation of the jury's consideration to acts of Zielinski committed in bad faith. Nor is there question of Zielinski's acts contributing to the loss. Had not Zielinski's complaisance in making false entries in the first instance, and his continuance of them later, been depended upon, the overdraft could not have been effected with respect to the very first draft, or, if so effected, could not have been increased by the cashing of the rest. The court was not in error in permitting Zielinski's coverage under the schedule to be included in the maximum liability of the defendant, and we find no reversible error in the court's instructions with respect thereto.

■ Recovery for losses upon the Kempisty, Irene Kolowich, and Kolowich and Johns notes was allowed on the theory that they were actually the borrowings of Kolowich, who was the beneficiary of the loans. These loans, being in excess of the permissible limit of the statute, were brought about by the dishonest and criminal acts of Kolowich in arranging for and directing the loans to be made, and of Babcock in the one case, and of Babcock and Gosicki in others, in permitting the notes to be discounted and the money to be paid out thereon. There was evidence of substantial character in support of this theory and to sustain the verdict of the jury in response thereto. We find no error in the denial of peremptory instructions upon this ground, in receiving the notes as evidence, or in the charge of the court permitting the items represented by them to be considered as losses covered by the bond.

■ We come now to the interpretation put by the court upon the bond. It will be noted that the total coverage provided during the second period involved, that covered by the third schedule, on all the four employees claimed to have been responsible for the several losses sued upon, was $70,000. The District Judge permitted recovery up to a maximum of $80,500. This was on the theory that the bond was a cumulative, or multiple liability, contract, or, in other words, that the fidelity of Kolowich having been insured in the first period for $10,000, and likewise during the second period for $10,000, and a loss having resulted through the acts of Kolowich in each period equal to or greater than the total coverage, the insurer's liability for Kolowich's defalcations or abstractions was $20,000, and that, since Babcock's fidelity was insured in the first period for $25,000, and in the second period for $25,000, and since some of the loss through the acts of Babcock occurred in the second period and some in the first period, the total coverage for the fidelity of Babcock was $50,000, and the insurer's liability attached to the losses in each period, within the maximum coverage of each.

We think the court to have been in error in thus construing the bond. It is true that there are cases which hold that, where there is no limiting provision confining the liability to the single indemnity stated in the bond, such bonds have been construed as though the several continuations are separate and distinct contracts, each providing for a distinct and separate liability, and that, where losses occur during each premium period, they may be recovered up to the max-

226

imum limit of liability named in the bond for such period. Typical of these cases is that of Ætna Casualty & Surety Company v. Commercial State Bank (D. C.) 13 F.(2d) 474, wherein it was held that, where during one premium period a loss occurs which is not, however, discovered until after a second premium period has begun, the liability during the first period attaches upon discovery up to the maximum liability stated therein for any employee, and that similarly the liability for the fidelity of the employee during the second premium period likewise attaches up to the maximum of coverage for that employee during the subsequent period. The cases in accord are sufficiently cited in Judge Lindley's opinion, and the argument is interesting to the effect that, if the liability during one premium period is fully exhausted by losses therein occurring, even though not during such period discovered, there is no protection under the continued bond, and therefore no consideration for the subsequent premiums paid thereon. There is no unanimity of holding, however, even in the case of bonds thus described, though the modern tendency seems to incline toward the multiple contract theory. See 27 Michigan Law Review, 442, where the question is discussed under the title "Fidelity Bonds—Does it Pay to Renew Them?" However, where the bond itself contains an unambiguous provision limiting recovery to the single stated amount therein for any employee, there is no room for construction, and total liability must be limited to such amount no matter how long the bond has been in force or how many premiums are paid for the insurance. State of Oklahoma v. New Amsterdam Casualty Co., 110 Okl. 23, 236 P. 603, 42 A. L. R. 829; Michigan Mortgage-Investment Corp. v. American Employers' Insurance Co. of Boston, 244 Mich. 72, 221 N. W. 140; United States Fidelity & Guaranty Co. v. First National Bank, 233 Ill. 475, 84 N. E. 670. See note, 42 A. L. R. 834. The case of Maryland Casualty Co. v. First National Bank, 246 F. 892, 899 (C. C. A. 5), though cited by the appellee, is not contra. Although the contract in that case was held to be separate and independent for each premium period, Judge Walker specifically distinguished the situation there involved from cases like the one at bar in the following language: "Rulings made in cases involving contracts which contained stipulations for renewals and such provisions as one stating that the named amount of insurance was to cover losses occurring during the continuance of the bond or any renewal there-

of, or one stating that the liability of the insurer should not be cumulative, or one stating that the liability should not be for more than a stated sum, whether the loss occurred during the term of the policy or bond or a continuance thereof, or other similar provision, are not applicable to the facts of the instant case."

The bond in this case, as has already been observed, was expressly a continuing bond. By the amendment made to it in the second schedule on September 3, 1929, it was specifically recited that the schedule should be deemed a part of the original bond and not a new obligation, nor create cumulative liability. This provision cannot be ignored or dismissed as meaningless. It is true that the practical effect of such clauses in fidelity bonds, as indicated in the Michigan Law Review note above cited, is the creation of a situation wherein one employer buying fidelity insurance each year in a new company receives multiple protection, whereas another who, because of satisfactory dealings with his insurer, renews in the same company, receives but single protection for all premium periods, though the cost to him is exactly the same. The remedy for this situation, however, lies with the fidelity companies or with the Legislatures, and not with the courts. We cannot protect the insured against his own bad bargain, and, where the contract is clear and unambiguous, there is no room for construction. National City Bank v. National Security Co., 58 F.(2d) 7, 8 (C. C. A. 6); Kirkby v. Federal Life Insurance Co., 35 F.(2d) 126 (C. C. A. 6).

Our conclusion is, therefore, that the maximum liability of the appellant on its bond was $70,000, made up of a single liability for the fidelity of Kolowich in the sum of $10,000, a single liability for the fidelity of Babcock in the sum of $25,000, a single liability for the fidelity of Gosicki in the sum of $10,000, a single liability for the fidelity of Zielinski, in the sum of $25,000.

 Some other phases of the case remain to be discussed. The appellant complained of and objected to the admission of any evidence on the ground that the declaration did not particularize as to the amount of loss claimed to be due to the wrongful act of each employee, nor as to the period in which such losses occurred, and that the bill of particulars was no more specific. It was open to the appellant before trial to challenge the sufficiency of the declaration by appropriate motions or other pleadings, and to request a more specific

bill of particulars. Not doing so, it was, we think, too late in submitting its grievance to the court after the jury was impaneled and the trial begun. Nor was the court in error in failing to require special verdicts by the jury as to the losses suffered through each individual employee. It was open to the appellee under the Michigan practice, rule 37, section 7, Revised Michigan Court Rules 1931, to make requests for special verdicts, and it may still be open to it to make such requests upon retrial. In so far as such special verdicts may aid the appellant to fix liability in the event that it pursues its rights to subrogation after payment of loss, relief was, and probably still is, in its own hands.

We may add, for the guidance of the court below, that we attach no importance to the several spellings and initials by which Gosicki was described in the schedules and declaration. The case below was tried upon the theory that M. A. Gosicki (Goscicki) and A. Gosicki are one and the same person, and the question of identity appears not to have been raised at the trial. Nor is there any importance to the fact that Zielinski was variously referred to as paying teller and as assistant cashier, and Babcock as loan manager and cashier. In so far as there appeared to be some confusion as to whether a general exception to the granting or denial of requests for instructions sufficiently saved questions for review, we assume that upon retrial such confusion will no longer prevail. Detroit Edison Co. v. Stricker, 65 F.(2d) 126 (C. C. A. 6).

Reversed and remanded for new trial.