PEOPLE *v*. PARISI.

1. CRIMINAL LAW—BANK ROBBERY—IDENTIFICATION—ALIBI.

   In prosecution for bank robbery, conviction *held*, not against great weight of the evidence, which included positive identification of the defendant and car he used, by eyewitnesses and his attempted alibi was not convincing.

2. SAME—EVIDENCE—WRITTEN STATEMENTS.

   The conditional withholding from defendant's attorney of written statements alleged to have been made by defendant charged with bank robbery and by witness who testified for him *held*, not reversible error, where report of police officer who investigated crime was introduced and, under the circumstances, the statements were not usable for impeachment purposes.

3. SAME—MISTRIAL—MISCONDUCT OF JUROR.

   Refusal to direct a mistrial for alleged misconduct of a juror *held*, not error, where trial judge investigated the incident, took testimony of all the parties and had confidence in the credibility of juror who denied making alleged remarks.

4. SAME—ARGUMENT OF PROSECUTOR.

   Reference by prosecuting attorney, in his closing argument to the jury, to the effect that frequently criminal overlooks something in perpetrating a crime and mentioning broadly publicized case from another State as an example *held*, not so prejudicial as to be reversible error, where prosecutor was immediately halted, ordered not to continue along that line, remarks were in nature of reply to defendant's attorney and case referred to did not involve a crime similar to that with which defendant was charged.

5. SAME—RES GESTÆ—NEW TRIAL—DESCRIPTION OF APPAREL.

   Denial of new trial on ground of prosecutor's failure to produce as *res gestæ* witness, woman who had provided police with description of apparel of men who had parked the car used by bank robbers at location where defendant was subsequently caught in the act of starting it and which description differed from that of the defendant's then apparel *held*, not an abuse

of discretion, since she could not describe features of the men she saw and prosecutor is not shown to have known of her existence until after the trial.

6. SAME—WITNESSES—REFRESHING RECOLLECTION—TRANSCRIPT OF TESTIMONY ON EXAMINATION.

While the practice of furnishing to witnesses transcript of testimony taken on examination before magistrate is not to be commended, yet it is not error to do so for the purpose of refreshing their recollection.

7. SAME—HEARINGS BEFORE MAGISTRATE—FURNISHING WITNESSES TRANSCRIPT BY PROSECUTOR.

Hearings before a magistrate and testimony taken there are public and transcript thereof is filed in the public records, hence mistrial should not be granted merely because transcript is made available to witnesses by prosecutor.

Appeal from Shiawassee; Collins (Joseph H.), J. Submitted January 17, 1935. (Docket No. 147, Calendar No. 37,865.) Decided March 5, 1935.

Nick Parisi was convicted of bank robbery. Affirmed.

*George K. Williams,* for appellant.

*Harry S. Toy,* Attorney General, and *Norman L. DesJardins,* Special Assistant Prosecuting Attorney, for the people.

BUTZEL, J. Nick Parisi was convicted of committing bank robbery and was sentenced to life imprisonment. The testimony shows that at about 9:30 a. m., on July 28, 1933, defendant and a confederate entered the Vernon State Bank in the village of Vernon, Michigan, and while defendant covered John Hardy, an employee of the bank, with a revolver, his confederate forced another employee, Iva Conrad, to open the safe in the vault. The confederate then entered the vault and stole

$1,607 in cash and some travelers' checks. While the robbery was in progress, Guy Langdon, a customer, accompanied by his young daughter, Marietta, arrived at the bank, having driven from his home in Bancroft, Michigan. Langdon entered the bank while his daughter remained in the car. He was forced by defendant, at the point of a gun, to lie down with his face towards the floor. After taking the money and locking Langdon and the two employees in the vault, the two robbers hurriedly drove away in a Ford sedan that was parked in front of the bank. In the meantime, the suspicions of Langdon's daughter had been aroused by what she saw and heard. She summoned help, and her father and the two employees of the bank were quickly released. She also noted the license number, 22–202, of the Ford sedan in which the bandits drove away, as well as the maroon color of the car and its red wheels. The car was further identified by two other witnesses, one of whom had written down the license number, 22–202, at the time. The police were immediately notified of the robbery.

By a strange coincidence defendant's brother Sam, who owned the Ford car, had reported its theft to the Detroit police at 7 a. m. on the day of the robbery. The car was located by the police at the corner of Keeler and Cherrylawn avenues in Detroit, where someone had left it, and a police officer was detailed to watch it. Late in the afternoon of the same day, the officer from his place of concealment saw defendant approach the car with an evident air of familiarity, and as defendant hurriedly unlocked the car, preparatory to driving it away, the officer arrested him. Defendant claims that he was informed of the location of the car and was given the key in an envelope by a man he met in a pool room.

He claimed to know this man as "Bob," but otherwise did not identify him.

Hardy and Langdon, and the latter's daughter, all identified defendant in a police show-up at the Detroit police station, where he was lined up with seven other men and Langdon and Hardy both identified defendant at the trial as the robber who particularly looked after them while his confederate entered the safe. Although the record shows that the witnesses differed as to some details in their descriptions of the robber who is claimed to have been the defendant, these discrepancies might very naturally have resulted from their excited and nervous condition when confronted by robbers with drawn revolvers. Hardy stated that the bandit who pointed his gun at him for over five minutes was about 35 years of age, weighed about 160 pounds and had a swarthy complexion. As a matter of fact, defendant is 23 years of age and weighs 135 pounds. Hardy, however, could see only the upper part of the bandit's body on account of an intervening partition about 4 feet in height. Langdon stated that the robber wore a mustache. Although defendant had no mustache when arrested, Langdon's description of the robber very closely corresponds to that of defendant in all other respects.

Defendant gave notice of an alibi, which he attempted to support by his own testimony as well as that of others. His brother Tom stated that between 9 and 10 a. m. of the morning of the robbery they went together to the store of one Younan, where they made a purchase. Younan states, however, that the hour at which he saw defendant on that day may have been 12 o'clock noon. Another witness, who operated a gas station, stated that he saw defendant about an hour before 12 o'clock on

the same day. Defendant took the witness stand and testified that he had remained at the apartment of one Mildred Yoho the previous night, and that he was awakened at 7 a. m. on the following morning by his brother Sam, who informed him of the theft of his car. Sam testified that he had locked the car the night before, that he kept the keys in his pocket, and that no one else had a key to the car. Mildred Yoho testified that defendant did not leave her apartment until 10 a. m. on the morning of the robbery. On re-direct examination, however, she admitted that on examination before the magistrate she had testified that defendant left her apartment some time before 7 in the morning, and returned between 12:30 and 1 p. m. The testimony showed that Vernon, Michigan, where the robbery occurred, is only 70 miles from the place where the car was found abandoned in Detroit, a distance which easily could be traversed by a fast-moving car in an hour and a half.

The identification of defendant by the eyewitnesses to the robbery was positive, while his attempted alibi is not at all convincing. In addition, there was no question as to the identification of the car. The noting of the car number and its distinctive features at the time of the robbery; its discovery in Detroit later on the same day; defendant's unsatisfactory explanation as to how he learned of the car's location and obtained the key to it—all constitute circumstantial evidence of such nature that, when combined with the positive identification of defendant by the eyewitnesses to the robbery, we are led to the conclusion that the verdict of the jury was not against the great weight of the testimony.

Error is claimed because of the prosecutor's refusal to exhibit to defendant's attorney certain written statements alleged to have been made by defendant and Mildred Yoho. Defendant's own statement was of no conceivable value to him. He must have known what was contained therein. As for Miss Yoho's statement to the prosecutor, it could only have been of value to the defendant had she testified against him, in which case it might possibly have been used for impeachment purposes. On the contrary, however, although Miss Yoho's name was indorsed on the information, she was one of the witnesses used by defendant to prove the alibi claimed by him. Although she was produced as a witness by the prosecutor, only a few preliminary questions were asked of her and she was then excused, after defendant had objected to her being interrogated as to the length of time he had remained at her apartment on the night prior to the robbery. She was later recalled as a witness for defendant. The prosecuting attorney offered to furnish the statements to counsel for the defendant on condition that they be introduced in evidence by defendant, but this offer was refused. There was no error in withholding the statements from defendant's attorney under the circumstances. The case is not ruled by *People* v. *Dellabonda,* 265 Mich. 486, where we held that the report of a police officer who made an investigation and submitted a full report immediately after the commission of the crime should not have been withheld. In the instant case the complete report of the police officer who made the investigation was introduced in evidence.

Error is further claimed because of the court's refusal to order a mistrial when informed of the alleged misconduct of a juror. Defendant alleges

that, while a public lunch was in progress in the basement of the court house, a juror came in and took a seat next to Miss Yoho, stating that he wanted to sit down and have dinner next to a good-looking girl. It is claimed that Miss Yoho asked the juror whether he believed defendant to be guilty, and that he replied in the affirmative. Miss Yoho signed an affidavit stating that the man who accompanied her did the questioning; that he asked the juror how the case looked, and the latter replied, "It looks awful bad." On the other hand, Miss Yoho's companion stated in his affidavit that no evidence in the case was discussed, but that the general substance of the juror's remarks, in reply to a question put to him by Miss Yoho, was that it looked bad. The two witnesses do not agree as to which of them began the conversation, or who asked the question. On the other hand, the trial judge investigated the incident and took testimony of all the parties, and the juror positively denied that he made any remarks in regard to the case. The judge stated that he had known the juror for a great many years, and that his reputation was such that he had confidence in his credibility. Under the circumstances, there was no error in the refusal of the trial court to declare a mistrial.

On the final arguments, the attorney for defendant declared it to be unlikely that a robber would return to a car he had used in a hold-up on the same day. This remark prompted a reply by the prosecutor to the effect that frequently something is overlooked by a criminal in the perpetration of a crime, and he referred to the "Bobbie Franks" case as an example. The argument was not taken down by the stenographer, and, upon objection being made to the remark, the court immediately halted

the prosecutor and ordered him not to continue along that line. The remark was improper, and had the prosecutor not followed the instructions of the trial judge it might have led to serious consequences. However, the "Bobbie Franks" case referred to by the prosecutor, better known as the "Loeb-Leopold" case, did not involve a bank robbery, took place in a different jurisdiction, and in no way resembled the case at bar. The reference, under the circumstances, did not come under the rule laid down in *People* v. *Kolowich,* 262 Mich. 137, 150.

Further error is charged because the prosecutor did not produce as a *res gestæ* witness a woman who had provided police officers with a description of the apparel worn by two men whom she had observed parking the Ford car at the location where defendant was subsequently caught in the act of starting the car. The apparel as described was not similar to the clothes worn by defendant when apprehended. Although this witness was known to the police, there was no showing that she was known to the prosecutor until after the trial. The prosecutor states in his brief that he knew nothing about the witness until the motion for a new trial was made on behalf of defendant; that up to that time he was unaware of her existence, or of any one by that name who knew anything about the case. The failure of the trial judge to grant a new trial on this ground was no abuse of discretion. The witness was unable to describe the features of the men she observed in the Ford car, and we do not believe her observation was of sufficient importance to have made any difference in the result of the case, even had the witness been produced.

Defendant stresses the fact that after the preliminary examination before the magistrate the tran-

script of the testimony was shown to the witnesses, and that Langdon's young daughter, who had not been a witness before the magistrate, read the transcript when it was sent to her father. The judge instructed the jury that it was not error to show the testimony to witnesses for the purpose of refreshing their recollection. While it is true that this was not error, we cannot commend the practice. It might be argued that the effect of furnishing such testimony would be to coach the witness as to how to testify at the trial. However, hearings before a magistrate, and the testimony taken there, are public and are frequently written up in the press, and in addition a transcript is filed in the public records. The information was therefore available to the witnesses even had it not been furnished to them by the prosecutor, and a mistrial should not be granted simply because the testimony was made available by him.

We do not believe that the other claims of error are of sufficient merit to warrant further discussion. Defendant's conviction was proper, and it is herewith affirmed.

POTTER, C. J., and NELSON SHARPE, NORTH, FEAD, WIEST, BUSHNELL, and EDWARD M. SHARPE, JJ., concurred.